**No. 25-30514**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

MAYA DETIEGE; DAYNE SHERMAN,

*Plaintiffs-Appellants,*

v.

KATRINA R. JACKSON

*Defendant-Appellee*

---

On Appeal from the United States District Court for the Western District of
Louisiana,
Case No. 3:23-CV-175

---

**BRIEF OF APPELLANTS MAYA DETIEGE AND DAYNE SHERMAN**

---

Bruce Hamilton, La Bar No. 33170
Annie Cleveland, La Bar No. 41473
Hallie Feinman, Student Attorney
Sam Montanari, Student Attorney
Henry Solotaroff-Webber, Student Attorney
Tulane First Amendment Clinic
6329 Freret Street, Suite 130
New Orleans, La 70118
bhamilton1@tulane.edu
acleveland@tulane.edu
o: (504)862-8813

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal:

| | |
|---|---|
| Maya Detiege | Plaintiff-Appellant |
| Dayne Sherman | Plaintiff-Appellant |
| Tulane First Amendment Law Clinic | Counsel for Plaintiffs |
| Bruce Hamilton | Counsel for Plaintiffs |
| Anna Cleveland | Counsel for Plaintiffs |
| Senator Katrina R. Jackson | Defendant-Appellee |
| Caitlin Huettemann | Counsel for Defendant |
| Thomas Moore Hayes IV | Counsel for Defendant |
| Jorge Benjamin Aguinaga | Counsel for Defendant |
| Office of the LA Attorney General | Counsel for Defendant |

/s/Anna Cleveland
Attorney of Record for Plaintiffs

i

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to 5th Cir. R. 28.2.3, Plaintiffs-Appellants respectfully request oral argument. This case presents important constitutional concerns involving the public's right to engage with and receive information from elected officials. This case also presents the Fifth Circuit's first opportunity to apply the test set forth by the Supreme Court in *Lindke v. Freed*, 601 U.S. 187 (2024), which determines when a state official's social media use constitutes state action for the purposes of 42 U.S.C. § 1983.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ...................................................... I

**STATEMENT REGARDING ORAL ARGUMENT** .......................................... II

**STATEMENT OF ISSUES** ............................................................................... 1

**STATEMENT OF CASE** .................................................................................. 2

   I.   INTRODUCTION ........................................................................................ 2

   II.   STATEMENT OF FACTS ............................................................................ 5

   III.  PROCEEDINGS BELOW ........................................................................... 8

**SUMMARY OF ARGUMENT** ....................................................................... 9

**ARGUMENT** ................................................................................................. 11

   I.   DEFENDANT ACTED UNDER THE COLOR OF LAW WHEN SHE BLOCKED PLAINTIFFS ON TWITTER. ...................................................................... 11

     A.   *The District Court Erroneously Defined "State" for this Inquiry.* ........... 13

     B.   *Written Law Authorized Defendant to Speak on Behalf of the State.* ......... 16

       1.   The Lower Court Interpreted Plaintiffs' Cited Sources of Actual Authority Too Narrowly. ..................................................................... 16

       2.   Written Law Grants Defendant Actual Authority to Speak. ................... 18

       3.   Jurisprudence Supports Finding That Informing the Public Is a Duty of Legislators and May be Actionable Under 42 U.S.C. § 1983. ...................... 21

     C.   *Longstanding Custom Granted Defendant Authority to Speak on Behalf of the State.* ....................................................................................... 23

     D.   *Defendant's Authority to Speak Encompasses Speech Made Online.* ........ 31

**CONCLUSION** ............................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) .......................................... 12, 23

*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536 (5th Cir. 2005) ............................ 11

*Cedyco Corp. v. Petroquest Energy LLC,* 497 F.3d 485 (5th Cir. 2007) .............. 11

*Cole v. Gray*, 638 F.2d 804 (5th Cir. 1981) ........................................................ 22

*Does v. Haaland*, 973 F.3d 591 (6th Cir. 2020) .................................................. 21

*Garnier v. O'Connor-Ratcliff,* 136 F.4th 1181 (9th Cir. 2025) ............. 12, 15, 17, 31

*Good New Club v. Milford Central School,* 533 U.S. (2001) ................................. 3

*Hutchinson v. Proxmire,* 443 U.S. 111 (1979) .................................................... 21

*Lamb's Chapel v. Center Moriches Union Free School Distr.,* 508 U.S. 384 (1993) ........................................................................................................................... 3

*Lindke v. Freed*, 601 U.S. 187 (2024) ............... 4, 6, 9, 11, 12, 13, 14, 15, 16, 17, 20, 21, 22, 23, 24, 29, 32

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) .............................................. 13

*Lunderstadt v. Colafella*, 885 F.2d 66 (3d Cir. 1989) .......................................... 22

*Mackey v. Rising*, 106 F.4th 552 (6th Cir. 2024) ................................................ 12

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ................................................... 3

*Morgan v. Plano Ind. School Dist.,* 589 F.3d 740 (5th Cir. 2009) ........................ 11

*Nixon v. City of Hous.*, 511 F.3d 494 (5th Cir. 2007) ..................................... 29, 30

*Packingham v. North Carolina*, 582 U.S. 98 (2017) .......................................... 2, 32

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001). ............................... 23

*Police Dep't of Chicago. v. Mosley*, 408 U.S. 92 (1972) ........................................ 2

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...................................................... 2

*Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997) .......................................... 3, 31

*Robinson v. Hunt Cnty.,* 921 F.3d 447 (5th Cir. 2019) ....................................... 2, 4

*Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23 (1st Cir. 1996) ...................... 22

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ...... 2, 3

*Sharratt v. Murtha*, 437 F. App'x 167 (3d Cir. 2011) .......................................... 21

*Street v. New York,* 394 U.S. 576 (1969). ............................................................ 4

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) ................................................ 4

*United States v. Macdaniel*, 32 U.S. 1 (1833) .................................................... 16

*Webster v. City of Houston*, 735 F.2d 838 (5th Circ. 1995). ................................. 23

*White Buffalo Ventures, LLC v. Univ. of Tex.*, 420 F.3d 366 (5th Cir. 2005) ......... 11

*Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689 (5th Cir. 2007) ....................... 30

*Williams vs. United States*, 71 F.3d 502 (5th Cir. 1995) ...................................... 21

*Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009) ............................................ 21

**Statutes**

La. R.S. § 12:231 ............................................................................................ 18
La. R.S. § 42:141 ............................................................................................ 19
La. R.S. § 42:62(7)........................................................................................... 18

**Other Authorities**

BLACK'S LAW DICTIONARY (12th ed. 2024........................................................ 13
LOUISIANA LEGISLATURE, *Information and Activity Book 7,*
   *https://lco.legis.la.gov/docs/Legislator.pdf* ................................................ 31
United States Senate Manual, 118th Congress, Standing Rules of the Senate at 42,
   Committee Procedure 26.4(a)(2023-2024)............................................... 20

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................... 11
La. S. Rule § 10.11.......................................................................................... 19
La. S. Rule § 13.73 (B) ................................................................................... 20
La. S. Rule § 17.6............................................................................................ 20
La. S. Rule § 5.3.............................................................................................. 18
La. S. Rule § 6................................................................................................. 18
La. S. Rule § 7.6 (C) ...................................................................................... 19

**Treatises**

Louisiana Civil Law Treatise, 20 LACIVL § 2:1 ........................................ 18

**Constitutional Provisions**

42 U.S.C. § 1983............................................................................................... 9
La Const. Art. I § 1 ........................................................................................ 18
La. Const. art. III, § 1..................................................................................... 18
La. Const. Art. III, §1...................................................................................... 18
La. Const. Art. III, Sec. 9 .............................................................................. 13
La. Const. art. X, § 30..................................................................................... 19
La. Const. Preamble, Ann. Refs & Annos .................................................... 18

## JURISDICTION

Federal court jurisdiction exists because Plaintiffs-Appellants Maya Detiege and Dayne Sherman allege violations of the First Amendment. 28 U.S.C. § 1331. This Court has jurisdiction because Plaintiffs appeal from final judgment dismissing their claims. 28 U.S.C. § 1291. The district court entered judgment on August 15, 2025 and Plaintiffs timely appealed on the September 12, 2025. ROA.2211, ROA.2316.

## STATEMENT OF ISSUES

I. Did the district court err in applying the new test articulated by the Supreme Court in *Lindke v. Freed* establishing when a public official's conduct on social media constitutes state action?

II. Does a state senator have actual authority to speak on behalf of the State?

**STATEMENT OF CASE**

## I.    Introduction

If a public official hosts a town hall and opens up a forum for public comment, it is unconstitutional for her to then silence or remove speakers based on viewpoint. This is a bedrock principle of First Amendment jurisprudence; the government "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). This is because the First Amendment protects the rights of citizens to freely criticize government policies they don't agree with. *Robinson v. Hunt Cnty.,* 921 F.3d 447, 447 (5th Cir. 2019).

In our modern era, social media is the new public square. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Internet forums are the digital equivalent of town halls where citizens may question, criticize, and hold their representatives to account. *See id.* Social media sites, such as Twitter, "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* When a government official, like Defendant Senator Katrina Jackson, opens up such forums for public dialogue, she may not then silence critics for being critical or expressing views with which she disagrees.  *See Good News Club v. Milford Cent.*

2

*School,* 533 U.S. 98 (2001); *Rosenberger,* 515 U.S. at 829; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Distr.,* 508 U.S. 384, 393-94 (1993).

The Supreme Court has recognized the importance of First Amendment protections for Internet speech. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997). Moreover, the Court has determined that imposing restrictions on Internet speech, specifically speech on social media, carries extensive and problematic implications, as the Court explained in another context:

> "Restricting access to social media can impair users' ability to speak to, learn from, and do business with others. Deleting the account of an elected official or candidate for public office may seriously impair that individual's efforts to reach constituents or voters, as well as the ability of voters to make a fully informed electoral choice….'content moderation' of the news or user comments on public affairs can have a substantial effect on popular views."

*Moody v. NetChoice, LLC*, 603 U.S. 707, 768 (2024) (Alito, J., Thomas, J., Gorsuch, J. concurring). That principle squarely applies here.

Defendant Senator Jackson utilizes her public Twitter account to promote her own legislation, communicate with constituents and voters across the state, engage in political discourse, and advance her legislative agenda. *See generally* ROA.1346-48, 1360-63, 1380-88 (Pls.' MSJ, citing to many of Defendant's Tweets demonstrating her activity on Twitter), ROA.1390-1403 (Pls.' Statement of

3

Uncontested Facts). Through her actions on Twitter, she created a forum for civic participation. *Id*. She then blocked Plaintiffs from participating in that forum because she disagreed with the content of their core political speech and the viewpoints that speech expressed. *See* ROA.1363-69 (Pls.' MSJ) ROA.1391-1401 (Pls.' Statement of Uncontested Facts). Such speech lies at the heart of the First Amendment's protection. *See Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Indeed, in *Robinson*, when considering social media censorship, the honorable Court reminded, "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." 921 F.3d at 447 (quoting *Street v. New York,* 394 U.S. 576, 592 (1969)).

The district court erred in holding that Senator Jackson's actions on Twitter do not constitute state action under *Lindke v. Freed*, 601 U.S. 187 (2024). By misapplying the test articulated in *Lindke* and holding that Defendant did not act under the color of state law when she blocked Ms. Detiege and Mr. Sherman, the district court sanctioned an elected official's ability to censor criticism and avoid constitutional scrutiny.

## II. Statement of Facts

Twitter,[1] one of the leading social media platforms, allows users to quickly post short-form messages containing 280 characters or less. ROA.1345. Since its creation in 2006, Twitter has amassed nearly 100 million American users. *Id*.

Defendant Senator Katrina Jackson is an elected official from Monroe, Louisiana. ROA.1346. Jackson has served as a Louisiana state senator for District 34 since 2019. *Id*. Prior to her service as a state senator, Senator Jackson was a member of the Louisiana House of Representatives. *Id*.

Defendant Jackson began using Twitter in March of 2012, shortly after she was elected as a state representative. *Id*. Her first tweet on March 9, 2012, stated, "On Monday at 12:00 Noon we will begin Legislative Session. Our office will update you daily." *Id*. Her original username on the platform was @RepKJackson. *Id*. She now tweets using the username "@KatrinaRJackson" and has historically utilized Twitter to communicate with the public, providing information and official press releases from her office. *See generally* ROA.1346-48. Her tweets make legislative announcements and address bills she filed or supported, and the work of various task forces and committees on which she serves. *Id*. Her tweets often include

---

[1] This case concerns the actions of Defendant Jackson on the social media website currently known as "X" and formerly known as "Twitter." *See* X.com. For the purposes of this brief, Appellants refer to the website as Twitter.

graphics identifying her as a state senator, proudly stating "From the office of Senator Jackson." *Id.*, ROA.1381. Legislative staff members, paid by public tax dollars, even make some of these graphics for the Senator to then tweet out to her followers.[2] ROA.1385. She tweets to solicit ideas and feedback from her followers and has often engaged with other Twitter users regarding her specific legislative actions and beliefs. *See generally* ROA.1346-48, 1360-61, 1384-85.

Plaintiffs Maya Detiege and Dayne Sherman are both active Twitter users and Louisiana residents who have interacted with Defendant Jackson on Twitter related to her statewide legislation. *See generally* ROA.1348-1353. Defendant Jackson blocked both Plaintiffs after they expressed criticism of her and her legislation on the platform. *Id.,* ROA.1363-69. Once Defendant blocked Plaintiffs from her account, they could no longer see or interact with any of her tweets. ROA.1386-88.

Mr. Sherman has a large following on Twitter where he often posts about current events, including Louisiana politics and legislative happenings. ROA.1351. Prior to blocking Mr. Sherman, Defendant Jackson interacted with him so much on Twitter that he was her fourth most-mentioned account. *Id*. Defendant Jackson and Mr. Sherman had previously engaged in amiable and substantive political back-and-

---

[2] This fact is especially significant, as the Supreme Court has said "an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business." *Lindke,* 601 U.S. at 203.

forth exchanges on the platform about pending and proposed legislation, including the issue of school vouchers. ROA.1352-54.

But Defendant blocked Mr. Sherman after he criticized legislation she sponsored to permit prayer in public schools. *Id*. Mr. Sherman reached out to Defendant Jackson via Twitter to discuss the bill, using the hashtag #stoptheprayerbill. ROA.1352. Defendant Jackson and Mr. Sherman debated the constitutionality of the bill on Twitter from April 4 to April 8, 2013 before she ultimately blocked Mr. Sherman over the issue, and he was no longer able to view or interact with her Twitter page. *Id*.

Defendant Jackson also blocked Ms. Detiege for criticizing her legislation. *See generally* ROA.1348-51. The Senator is an outspoken public figure for pro-life advocacy; she often speaks at national pro-life events and has drafted and championed important state-wide legislation relating to abortion access in Louisiana. ROA.1379, ROA.459. In June of 2022, just two days after the *Dobbs* decision, Defendant tweeted two graphics regarding her bill (SB 342), which explained how it amended Louisiana's 2006 "trigger law" that outlawed abortion with the exception of an abortion necessary to save the life of the mother. *See* ROA.1348-51. Ms. Detiege, who had previously experienced serious fertility issues, including a complicated and dangerous pregnancy, criticized Defendant Jackson by directly tweeting at Senator Jackson's account, as well as through her Twitter replies. *Id*. On

June 26, 2022, Ms. Detiege, herself a Black woman, tweeted: "I say this with all disrespect: burn in hell. You don't care about women. You don't care about pregnant people. You don't care about children. You don't care about education. I do not respect all black women. Some of you bitches are very dumb." *Id*.

Senator Jackson replied that her bill provided three million dollars for crisis pregnancy centers. *Id*. Ms. Detiege replied that the amount was a small percentage of the state budget, stating "thanks for the pennies, you (clown emoji)." *Id*. Defendant then asked Ms. Detiege, "Did you advocate for more?" ROA.1350. Ms. Detiege replied, "You're the one bragging about how much it is. You're the elected official. Did YOU advocate for more? Probably too busy not paying attention in committee meetings when your colleagues were asking questions ... Poor response from an elected official. Hope your career ends quickly [praying emoji]." ROA.1351. Defendant then blocked Ms. Detiege. *Id*.

### III.   Proceedings Below

Ms. Detiege filed suit to vindicate her First Amendment rights in February 2023. ROA.16. The complaint was amended the following August to include Dayne Sherman as a plaintiff. ROA.107. After extensive discovery, the parties filed cross motions for summary judgment. ROA.446, 1339-40. On January 13, 2025, the district court entered an Order Continuing Trial Without Date. ROA.1869. The district court issued its final judgment in the matter on August 15, 2025, denying

Plaintiffs' motion and granting Defendant's. ROA.2211. Plaintiffs appealed on September 12, 2025. ROA.2316.

## SUMMARY OF ARGUMENT

State officials are liable under 42 U.S.C. § 1983 when they deprive citizens of rights while acting under the color of state law. *See* 42 U.S.C. § 1983. The Supreme Court's decision in *Lindke v. Freed* affirmed that public officials are bound by the First Amendment when they use social media accounts in their official capacities and articulated a two-part test to determine when a government official's censorship of content on social media constitutes "state action" for the purposes of 42 U.S.C. § 1983 claims. 601 U.S. at 191, 198. Specifically, a state official must (1) possess actual authority to speak on the state's behalf and then (2) purport to exercise that authority when she speaks on social media. *Id.* at 198. The first prong can be met by showing that the official was granted the requisite authority though written law or by custom. *See id.* at 200. Plaintiffs must show that the public official had more than some authority to speak: "the alleged censorship must be connected to speech on a matter within [the public official's] bailiwick." *Id.* at 199. The Court emphasized that this test demands a fact-intensive inquiry; "[a] close look is definitely necessary in the context of a public official using social media." *Id.* at 197.

*Lindke* envisioned that the general grant of authority to a high-ranking official necessarily encompasses a grant of authority to speak about those acts officially in

some cases. *Id.* at 201. This is such a case. Defendant Jackson is a high-ranking government official whose responsibilities include communicating with the public about legislative matters, specifically the legislation she drafts and sponsors. ROA.1364. Therefore, when she uses her authority to suppress critical speech, even when that speech takes place on Twitter, she engages in censorship.

The district court erred by misapplying the first prong of *Lindke* and finding that Defendant did not possess actual authority to speak on behalf of the State. In ruling in favor of Defendant on the parties' cross motions for summary judgment, the district court disregarded two sources of written law granting Defendant actual authority to speak on behalf of the State: (1) Louisiana constitutional provisions that grant state legislators authority to speak and over legislative matters broadly, and (2) Louisiana chartering itself as a representative democracy in its Constitution. The district court also disregarded longstanding custom granting actual authority. In doing so, the district court did not adhere to Fifth Circuit precedent and interpreted Plaintiffs' cited provisions of law and custom too narrowly.

Here, Defendant Jackson acted under the color of law when she blocked Plaintiffs because of their viewpoints. She possessed actual authority to speak on behalf of the state and she purported to use that authority on her Twitter page. For the reasons below, Plaintiffs respectfully request that this Court overrule the district

court's judgment and find in favor of Plaintiffs, or, in the alternative, remand this case to the district court.

## STANDARD OF REVIEW

The Fifth Circuit reviews a district court's summary judgment order on cross motions de novo. *Cedyco Corp. v. Petroquest Energy LLC,* 497 F.3d 485, 488 (5th Cir. 2007). Each motion with its supporting evidence is independently reviewed. *Morgan v. Plano Ind. School Dist.,* 589 F.3d 740, 745 (5th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute as to a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005). All facts and inferences must be construed "in the light most favorable to the nonmoving party." *White Buffalo Ventures, LLC v. Univ. of Tex.,* 420 F.3d 366, 370 (5th Cir. 2005).

## ARGUMENT

**I.    Defendant Acted Under the Color of Law When She Blocked Plaintiffs on Twitter.**

Under the first prong of *Lindke*, a public official's social media activity constitutes state action when the official "possess[es] actual authority to speak on the state's behalf," as state action requires that the public official's conduct be "*fairly*

11

*attributable to the State*." 601 U.S. at 198 (internal citations omitted). Actual authority may be derived from explicit legal authorization, such as statutes or ordinances, as well as from broader considerations of whether, through custom or usage, an official's role or responsibilities entrusted them with the authority to address the public in an official capacity. *Id.* at 200-01. Such authority may also include the authority to speak online.[3] *See Id*.

The actual authority inquiry requires an examination of the specific job responsibilities of a public official to determine whether the speech being censored is a part of the public official's "bailiwick," or within the "portfolio" of responsibilities given to the public official. *Lindke*, U.S. 601 at 199. "There must be a tie between the official's authority and the gravamen of the plaintiff's complaint." *Lindke*, U.S. 601 at 199 (internal quotations omitted). *Lindke* emphasizes authority to speak on "job-related topics," so here, the relevant inquiry is the authority granted to a state legislator. 601 U.S. at 191; *see also Mackey v. Rising*, 106 F.4th 552, 559 (6th Cir. 2024) (the state official possesses the authority to take a challenged action only if the action meaningfully relates to the official's "governmental status" or the "performance of his duties." (internal citations omitted)).

---

[3] "An official need only have authority to speak for the state generally, not on social media specifically." *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1188 (9th Cir. 2025); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970).

Defendant Jackson blocked Plaintiffs for making critical comments related to her legislation—matters plainly within her official bailiwick as a legislator. ROA.2197-99. The district court's contrary finding was in error. *See* ROA.2208.

## A. The District Court Erroneously Defined "State" for this Inquiry.

As a threshold matter, the district court erred in accepting Defendant's incorrect interpretation of the term "state" under *Lindke*. Defendant claimed, and the district court accepted, that the relevant inquiry is whether Defendant can speak "on behalf of the State of Louisiana and/or the legislative body in which she sits." *See* ROA 2192. This misinterprets both the Court's reasoning in *Lindke* and the structure of a representative government.

"State" in the state-action inquiry refers to the governmental entity through which official power is exercised, not to the sovereign as a whole. *See Lindke* U.S. 601 at 198-99. Plaintiffs correctly asserted that "state" denotes "a political system of a body of people who are politically organized." *See* ROA 2119; BLACK'S LAW DICTIONARY (12th ed. 2024). That definition aligns with the Supreme Court's § 1983 jurisprudence, in which its consistent usage of "state action" encompasses conduct by officials of any branch, department, or political subdivision who exercise governmental authority under color of state law. *See e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 934-35 (1982).

13

Therefore, the key inquiry is not whether Defendant could speak for the entire State of Louisiana, but instead whether she acted under the auspices of her legislative office. *See* La. Const. Art. III, § 9 ("Legislative office is a public trust, and every effort to realize personal gain through official conduct is a violation of that trust. The legislature shall enact a code of ethics prohibiting conflict between public duty and private interests of members of the legislature."). Thus, the core consideration is whether she acted as a state legislator when she blocked Louisiana residents, whose lives are materially impacted by her legislation, from engaging with and viewing her Twitter account, which she routinely used to discuss and progress her legislation and legislative priorities.

*Lindke*'s reference to "state" authority confirms that individual officials may speak for their respective governmental units when using official channels. In *Lindke*, the Court examined whether a city manager's social-media activity was "official" by asking whether he had authority to speak on behalf of the City of Port Huron, it most assuredly did not require the City Manager to speak on behalf of the entire state of Michigan. *See* 601 U.S. at 199.

Accepting the lower court's interpretation of "state" as it pertains to the state action inquiry under *Lindke* creates an impractically narrow rule[4] that essentially

---

[4] The lower court essentially promulgates a new test answering the question of whether *"Louisiana* legislators customarily use Twitter to speak for the State." (Emphasis in the original). *See* ROA.2195. The focus must be on state legislators in general. Nowhere in *Lindke* does the

14

excludes nearly all elected officials below the governor, and virtually all members of multimember bodies, from § 1983 liability for speech-based exclusion on social media. *See* 601 U.S. at 197-200. Such interpretation authorizes state legislators to use their official authority online, announcing bills, soliciting feedback, and shaping policy in real time, while insulating themselves from recourse for potential civil harms. This cannot be what the *Lindke* Court intended.

The Court articulated a test to apply to **all** public officials based on the specific facts presented in *Lindke*–which involved the actions of a City Manager on Facebook–and explicitly instructed lower courts to consider the *specific facts of each case* when applying its test, taking into account the practical realities of modern governance and the specific public authority the official is exercising. *See Lindke,* 601 U.S. at 197-98 ("A close look is definitely necessary in the context of a public official using social media. There are approximately 20 million state and local government employees across the Nation, with an extraordinarily wide range of job descriptions—from Governors, mayors, and police chiefs to teachers, healthcare professionals, and transportation workers.")*; See also Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1188 (9th Cir. 2025). Because this test applies to all public officials,

---

court ask whether it's customary for city managers of Port Huron, Michigan, to speak on behalf of the state. 601 U.S. at 198-201. Instead, the inquiry is on the specific plaintiff and requires a fact-intensive inquiry. *Id.*

15

using all forms of social media, naturally the *Lindke* test demands some flexibility in both its application and interpretation by the lower courts.

### B. Written Law Authorized Defendant to Speak on Behalf of the State.

When utilizing Twitter as a communicative tool of her office, Defendant acted pursuant to authority granted to her as a state official to inform, represent, and be accountable to the public for her legislative work. This authority is derived from, and defined by, the laws and Constitution of Louisiana. *See infra* n. 14. Accordingly, the first prong of the *Lindke* test is met through express provisions of Louisiana law as well as through custom and usage.

### 1. The Lower Court Interpreted Plaintiffs' Cited Sources of Actual Authority Too Narrowly.

An official's scope of power can be established through statutes, ordinances, regulation, custom, or usage. *Lindke*, 601 U.S. at 200; *see United States v. Macdaniel*, 32 U.S. 1, 14 (1833) ("[A government official] is limited in the exercise of his powers by the law; but it does not follow, that he must show a statutory provision for everything he does."). Plaintiffs' motion for summary judgment briefed numerous sources establishing Defendant's actual authority. *See generally* ROA.1371-79. However, the district court erred by interpreting Plaintiffs' sources too narrowly and failing to consider the Supreme Court's guidance in *Lindke*. *See* ROA.2208 Specifically, it failed to consider whether Louisiana's grant of authority

16

to its legislators over legislative matters also encompasses the authority to speak about them. *See* ROA.2206-08. This directly contravenes *Lindke*, which requires "careful attention" to the relevant written law and instructs courts to consider whether a grant of authority over a particular subject matter may reasonably encompass authority to speak about it officially. *See* 601 U.S. at 201. For example, an official tasked with overseeing a public program or initiative would reasonably have the authority to speak about matters under the purview of that program, even if such authority to speak is not explicitly spelled out in formal ordinances. *See id.* It further erred in finding that the provisions of law do not explicitly or implicitly grant the authority upon legislators to speak generally on legislative matters. ROA.2206-08.

Instead of following the lower court's interpretation, which creates a virtually insurmountable burden for plaintiffs seeking to assert their First Amendment rights, the Ninth Circuit's interpretation of *Lindke* is instructive. In *Garnier v. O'Connor-Ratcliff*, the court considered whether two school board members acted under color of state law when they blocked users on social media. 136 F.4th at 1189. On remand, the court applied *Lindke* to the elected school board officials who, like Defendant Jackson, used social media to communicate extensively about official business. *See id.* The *Garnier* court carefully weighed the context of the officials' conduct and authority and concluded that the School Board members met *Lindke's* first prong of

17

actual authority. 136 F.4th at 1189. In doing so, the Ninth Circuit looked beyond whether written law explicitly stated that the defendants could speak on behalf of the state, to whether the provisions *recognized or indicated* such authority. *See id*. This approach recognizes the Supreme Court's caution in *Lindke* against over-reliance on "excessively broad job descriptions" while also interpreting written law carefully. *See id.* at 1188-90.

### 2. Written Law Grants Defendant Actual Authority to Speak.

It is a foundational principle of Louisiana's representative democracy that legislators are duty-bound to serve and be responsive to the people of Louisiana. *See* La. Const. Preamble, Ann. Refs & Annos; La Const. Art. I, § 1. This principle is further supported by provisions of the Louisiana Constitution and state law, which establish Defendant's authority to speak.

"[T]he legislative power of the state [is granted] in a legislature consisting of a Senate and a House of Representatives." La. Const. art. III, § 1. State statutes also specify that "[t]he legislative branch of state government includes the members of the Senate." La. R.S. § 42:62(7). The Louisiana Constitution empowers the Legislature to create laws, manage the state's finances, oversee budgets, and generate revenue through taxation. *See* La. Const. art. III, §1; Louisiana Civil Law Treatise, 20 LACIVL § 2:1. These powers are primarily executed through legislative

deliberation and communication with the public about pending or enacted legislation. *See id.*

Consequently, each state senator wields the power to propose, debate, and vote on legislation that either creates new laws or modifies existing ones based on the public communications. *See generally* La. R.S. § 12:231; La. S. Rule § 5.3 (2025); La. S. Rule § 6 (2025). To fulfill these duties, Louisiana requires every senator to take the constitutionally prescribed Oath of Office, pledging to "faithfully and impartially discharge and perform all the duties incumbent upon [her]." La. Const. art. X, § 30; *See also* La. R.S. § 42:141. Accordingly, not only does Senator Jackson have the authority, but she is also required by Oath to "perform all the duties" that flow from proposing, debating, and voting on legislation. The fact that not every duty is explicitly articulated does not negate this authority.

Similarly, the Louisiana Constitution states that the legislative office is a "public trust," and any effort to gain personal advantage through official conduct violates that trust. La. Const. art. III, § 9. Because of this, the Constitution requires the Legislature to enact a code of ethics for public servants. *See* La. R.S. 42:1101. The text explicitly acknowledges the individualized power each member of the Senate has and enacts a further law to prevent such abuse. *See id.*

Further, Defendant Jackson holds leadership positions and serves on multiple legislative committees and task forces, which are vital to the lawmaking process.

19

ROA.490-99; La. S. Rule § 13.1 (2025); La. S. Rule § 13.8 (2025). Committees debate and modify legislation, and no bill can move forward to the full legislature without committee approval. *See* La. S. Rule § 10.11. ROA.490-99. Legislative rules require committees to seek public input and make their proceedings accessible to the public.[5] ROA.490-99. These provisions support finding that speaking on legislative matters is "part of the job that the state entrusted" legislators, such as Senator Jackson, to do. These provisions also constitute a "grant of authority over particular subject matter," in this case legislation that "reasonably encompass[es] authority to speak about it officially." *See Lindke*, 601 U.S. at 200-01. A state legislator plainly has the authority to speak, and engage with the public, about her own legislation. To hold otherwise creates an absurd and undemocratic result, essentially concluding the grant of authority over legislative matters to legislators does not also grant the authority to speak about those same matters.

---

[5] *See* La. S. Rule § 7.6 (C) ("Every bill shall be printed upon introduction and shall be available for distribution to the members and to the public upon request."); La. S. Rule § 10.11 ("No bill or joint resolution shall be engrossed and passed to third reading unless a committee has held a public hearing thereon and has reported thereon."); La. S. Rule § 13.73 (B) ("In the event extraordinary circumstances require that the meeting of a standing committee be held at a place, day, or hour other than that regularly scheduled for it, the chairman….shall make public announcement of the change during open session of the Senate prior to the regularly scheduled meeting."); La. S. Rule § 17.6 "A verbatim record shall be made of all of the proceedings of the committee at each meeting, including all testimony of witnesses, shall be transcribed without delay, and shall be a public record."; *see also* United States Senate Manual, 118th Congress, Standing Rules of the Senate at 42, Committee Procedure 26.4(a)(2023-2024) "[e]ach committee…shall make public announcement of the date, place, and subject matter of any hearing to be conducted by the committee…" Perma: [https://www.govinfo.gov/content/pkg/SMAN-118/html/SMAN-118-pg41.htm.].

### 3. Jurisprudence Supports Finding That Informing the Public Is a Duty of Legislators and May be Actionable Under 42 U.S.C. § 1983.

This Court has previously determined that making announcements about legislative matters is part of the job that the state entrusted legislators, such as Defendant, to do. In *Williams v. United States,* this Court held that it is "a matter of law" that a "primary obligation" of legislators in a representative democracy is "informing constituents and **the public at large"** of issues being considered by their legislative body. *See* 71 F.3d 502, 507 (5th Cir. 1995) (emphasis added). Though *Williams* involved a federal legislator, this Court reached its conclusion solely by virtue of the legislator being a member of a representative democracy, not a member of Congress specifically. *Id*. The Fifth Circuit is not alone in the recognition of this obligation. *See e.g. Does v. Haaland*, 973 F.3d 591, 600 (6th Cir. 2020) (citing *Williams,* 71 F.3d at 507); *Sharratt v. Murtha*, 437 F. App'x 167, 173 (3d Cir. 2011) (citing i*d*.); *Wuterich v. Murtha*, 562 F.3d 375, 384 (D.C. Cir. 2009).

The Fifth Circuit's recognition of this "primary obligation," coupled with the Court's reasoning in *Lindke,* establishes Defendant Jackson's actual authority. *See Lindke* at 200-01 (directing courts to look to an official's actual responsibilities to discern whether they possess actual authority). Because it is a "primary obligation" of legislators in representative democracies to inform the public of legislative matters, it is illogical to find that informing the public is not necessarily "part of the

21

job that the State [that created the representative democracy] entrusted" the legislators to do. *See id*. at 201; *Williams* 71 F.3d at 507.

Courts have also determined that that state legislators can be held liable for their speech acts under § 1983. In *Hutchinson v. Proxmire*, the Supreme Court specifically highlighted that legislators do not enjoy legislative immunity for communicative acts which take place outside of the legislative chamber. 443 U.S. 111, 133 (1979). Though this decision dealt with liability for defamation, other courts including this one, have also applied this gloss on legislators' speech acts for § 1983 claims as well. *See Cole v. Gray*, 638 F.2d 804, 811 (5th Cir. 1981); *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 31-32 (1st Cir. 1996); *Lunderstadt v. Colafella*, 885 F.2d 66, 7879 (3d Cir. 1989).

*Cole* is one such case, wherein the plaintiff brought a suit against a state representative and a state senator under §§ 1983 and 1985, alleging that their actions, which included statements made outside of legislative chambers, worked to deprive him of his position in the military. 638 F.2d at 806. The Court first determined that the state legislators would not be entitled to legislative immunity for the statements made outside of chambers. *Id*. at 811. However, the Court then moved immediately to determining whether there was an actual deprivation of rights, rather than whether such an act constituted state action. *See id*. Other appellate courts have done the same. *See, e.g., Romero-Barcelo*, 75 F.3d at 31-32; *Lunderstadt*, 885 F.2d at 78-79.

This determination of whether the plaintiff's rights had been deprived, rather than upon whether state action was present, demonstrates that courts accept that state legislators act under the color of law when they carry out official acts through speech. This principle remains true regardless of the fact that the speech takes place in a social media, rather than through press releases or a newspaper. *See Lindke*, 601 U.S. at 201.

## C. Longstanding Custom Granted Defendant Authority to Speak on Behalf of the State.

Actual authority to speak need not be explicitly codified by a policy or law to constitute state action. Indeed, the Supreme Court instructs that "[a]lthough not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes,* 398 U.S. at 167-68. Custom is established through repeated behavior as opposed to sporadic incidents; "[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001). This Court has defined governmental custom as "persistent and widespread practice among certain employees." *Webster v. City of Houston*, 735 F.2d 838, 859 (5th Cir. 1995).  Going further, "those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected,

accepted practice." *Id*. at 842.The district court erred in not finding that Defendant had the authority to speak based on custom. ROA.2207-08; *see Lindke* 601 U.S. at 200-01.

Under *Lindke,* actual authority is established through custom when it has become "permanent and well settled" for state officials with the same position as the Defendant to speak on behalf of the state. *Id*. *Lindke* instructs courts to look to whether prior public officials, holding the same title and wielding the same authority, have "purported to speak on [the state's] behalf and have been recognized to have that authority for so long as to become permanent and well settled." *Id*. The Court then explained that officials purport to speak for the state when they do so in their official capacity or when they use speech "to fulfill [their]responsibilities pursuant to state law." *Id*. at 201 (internal quotations omitted). Here, the Legislature has issued statements recognizing this duty of legislators to speak to and inform the public, and there is a long and well-established history of legislators doing the same, both on and offline.  *(Text continued on next page).*

Virtually every sitting Louisiana state senator has spoken in an official capacity through some communicative means in an effort to inform the public on legislative matters, and the majority of them have done so over social media. [678910]

---

[6] Twitter:

Sen. Regina Barrow (@ReginaBarrow), X (Nov. 16, 2024, at 22:25 CT), https://x.com/ReginaBarrow/status/1858003444331594059 (on file with the author);

Sen. Gary Carter Jr. (@gm_carter), X (Apr. 17, 2024, at 21:43 CT), https://x.com/gm_carter/status/1780789141027930137 (on file with the author);

Sen. Patrick Connick (@Connickforla), X (June 10, 2024, at 17:38 CT), https://x.com/Connickforla/status/1800296508836995134 (on file with the author);

ROA.981-1018 (Twitter profile of Defendant Sen. Katrina Jackson);

Sen. Jay Luneau (@luneau_jay), X (Nov. 7, 2025, at 16:46 CT), https://x.com/luneau_jay/status/1986928248438304935 (on file with the author);

Sen. Blake Miguez (@BlakeMiguezLA), X (Apr. 24, 2025, at 09:19 CT), https://x.com/BlakeMiguezLA/status/1915410389019365714 (on file with the author);

Sen. Brach Myers (@BrachMyersLA), X (June 3, 2024, at 06:23 CT, https://x.com/BrachMyersLA/status/1797590014236541021 (on file with the author);

Sen. Jeremy Stine (@JeremyStine), X (Jan. 20, 2024, at 09:22), https://x.com/JeremyStine/status/1748727740923047987 (on file with the author)

[7] Facebook:

Sen. Robert Allain III, FACEBOOK (June 7, 2024), https://www.facebook.com/share/p/1G31KLQFLn/ (on file with the author);

Sen. Gerald Boudreaux, FACEBOOK (Oct. 30, 2025), https://www.facebook.com/share/p/1MTEs8W4v5/ (on file with the author);

Sen. Stewart Cathey Jr., FACEBOOK (Oct. 24, 2025), https://www.facebook.com/share/p/19sVvhtn5P/ (on file with the author);

Sen. Mike Fési, FACEBOOK (Sep. 4, 2025), https://www.facebook.com/share/p/1LzHjDo7A5/ (on file with the author);

Sen. Cameron Henry, FACEBOOK (July 2, 2025), https://www.facebook.com/share/p/1BUzcU6Srs/ (on file with the author);

Sen. Caleb Kleinpeter, FACEBOOK (July 17, 2025), https://www.facebook.com/share/p/14QtFQL8zkB/ (on file with the author);

Sen Beth Mizell, FACEBOOK, (Oct. 24, 2025, at 17:37 CT), https://www.facebook.com/share/p/1HMoKtDLsL/ (on file with the author) (reposted from Beth Mizell (personal page);

Sen. Bob Owen, FACEBOOK (July 28, 2025), https://www.facebook.com/share/p/16RMZdLdbq/ (on file with the author);

Sen. Thomas Pressly, FACEBOOK (Oct. 16, 2025 at 11:13 CT), https://www.facebook.com/share/p/1BAHtn6vaj/ (on file with the author);

Sen. William Wheat Jr., FACEBOOK (Aug. 19, 2025),
https://www.facebook.com/share/p/1BUkq8H2QZ/ (on file with the author).

[8] Instagram:
Sen. Heather Cloud (@heather_m.cloud), INSTAGRAM (May 21, 2025),
https://www.instagram.com/p/DJ65tPYxS-I/ (on file with the author);
Sen. Royce Duplessis (@royce_duplessis), INSTAGRAM (Oct. 23, 2025),
https://www.instagram.com/p/DQKwx7ZCXJS/ (on file with the author);
Sen. Valarie Hodges (@valariehodges_), INSTAGRAM (Oct. 20, 2025),
https://www.instagram.com/p/DQC_rU1kpCA/ (on file with the author);
Sen. Sam Jenkins (@saml.jenkins), INSTAGRAM (Jan.. 23, 2025,
https://www.instagram.com/p/DFLEk3TMISa/ (on file with the author);
Sen. Ed Price (@senatoredprice), INSTAGRAM (Dec. 13, 2023),
https://www.instagram.com/p/C0z-VEKLaEB/ (on file with the author);
Sen. Larry Selders (@larry4louisiana67), INSTAGRAM (Sep. 29, 2025),
https://www.instagram.com/p/DPMqx5pjuBR/ (on file with the author).

[9] Public Outreach
Sulphur High School, *Today was such a special day in AP Government! Our students had the opportunity to hear directly from Senator Mark Abraham about his experiences in the Louisiana State Senate and the legislative process.*, FACEBOOK, (Sep. 17, 2025),
https://www.facebook.com/share/p/16cT6tho7V/ (on file with the author);
Amber McDown, *Senator Adam Bass highlights legislative progress at Lions Club meeting*, MINDEN PRESS-HERALD: News (Jan. 17, 2025), https://press-herald.com/senator-adam-bass-highlights-legislative-progress-at-lions-club-meeting(on file with the author);
Image posted by Sen. Regina Barrow, *Join us tomorrow to learn more about the new laws passed in the 2025 legislative session!*, INSTAGRAM (Aug. 27, 2025),
https://www.instagram.com/p/DN4kdP9jaTi (on file with the author);
Sen. Gerald Boudreaux, *I look forward to tonight's town hall meeting and hope to see you all there*, FACEBOOK, (Sep. 17, 2024),
https://www.facebook.com/share/p/1AGTKeG94s/ (on file with the author);
Mary Ditch, *Town Hall Meetings for Senator Mike Fesi's district set for August*, Houma Times (Aug. 17, 2022), https://houmatimes.com/news/town-hall-meetings-for-senator-mike-fesis-district-set-for-august/(on file with the author);
PAR LOUISIANA, *The PAR Perspective: 2025 Legislative Session – What Happened?* (featuring Sen. Cameron Henry) (YouTube, July 17, 2025),
https://youtu.be/uQZ01aWyDiA?si=fJzsG80zqGGhow (on file with the author);
Defendant Sen. Katrina Jackson, *Tensas Parish join us for a Legislative Community Meeting tomorrow at 5:30 pm!!!*, INSTAGRAM (Aug. 27, 2025),
https://www.instagram.com/p/DN4jjCbDI2C/ (on file with author);
Sen. Sam Jenkins, *Come out and let us hear from YOU! Thanks,*, FACEBOOK (Aug. 31, 2025),
https://www.facebook.com/share/p/1DEhdU6cKv/ (on file with the author);
Billy Nungesser, *Thank you to Senator Beth Mizell for hosting the Town Hall Meeting - Improvements to Bogue Chitto SP with me last night*, FACEBOOK, (Mar. 4, 2020),
https://www.facebook.com/share/p/1BhpeXyBPM/ (on file with the author);

26

Sen. Brach Myers, FACEBOOK, (Sep. 24, 2025),
https://www.facebook.com/share/p/1CRbdu1HSG/ (on file with the author);
Sen. Bob Owen, FACEBOOK (June 27, 2025), https://www.facebook.com/share/p/1AF5rRBdjm/
(on file with the author);
*Join Us For Small Business Town Halls in Shreveport, Lafayette*, NFIB (Sep. 2, 2025),
https://www.nfib.com/news/news/join-us-for-small-business-town-halls-in-shreveport-lafayette/
(on file with the author) (detailing town hall meetings with Sen. Mike Reese and Sen. Alan
Sebaugh);
Sen. Larry Selders, INSTAGRAM (Sep. 29. 2025), https://www.instagram.com/p/DPMqx5pjuBR/
(on file with the author);
*Lawmakers host July 15 town hall meeting on carbon capture project*, AN17 LOCAL NEWS (July
9, 2025), https://www.an17.com/news/events/lawmakers-host-july-15-town-hall-meeting-on-
carbon-capture-project/article_b743b758-1edb-42e1-a039-c4f21bed3be3.html (on file with the
author) (detailing town hall meeting with Sen. William Wheat Jr.)

[10] Interview or News Article
*Exclusive Interview: State Senator Robert Allain Discusses New Congressional Map Recently
Passed by Legislature*, KQKI NEWS (Jan. 24, 2024),
https://kqkinews.com/exclusive-interview-state-senator-robert-allain-discusses-new-
congressional-map-recently-passed-by-legislature/ (on file with the author);
Video posted by Sen. Barrow, *Fresh perspective from both sides of the aisle - proposed
legislation, community issues that affect you the constituent with host for InSight Rouge Senator
Regina* Barrow, FACEBOOK (June 27, 2025),
https://www.facebook.com/watch/?v=1640601843294885 (on file with the author);
Mornings with Brian Haldane, *Adam Bass Fights for Truth in Advertising*, TALK1073 (Apr. 25,
2024, https://talk1073.com/2024/04/25/adam-bass-fights-for-truth-in-advertising/ (on file with
the author);
KLFY NEWS 10, *Gerald Boudreaux speaks on new districts* (YouTube, Jan. 23, 2024),
https://youtu.be/_wQBgo-4g4c?si=1A59q-ScMElLKgmx (on file with the author);
Video posted by Sen. Heather Cloud, FACEBOOK (Apr. 22, 2024),
https://www.facebook.com/watch/?v=1113536859888869 (on file with the author);
WWLTV, *Discussing Special Session on crime with Sen. Connick, Vera Louisiana* (YouTube
Feb. 21, 2024), https://youtu.be/fFok74veg5s?si=UXgRoUT7a2IoOIiD (on file with the author);
Video posted by Sen. Royce Duplessis, *Today is the first day of the 2025 Regular Session. I
joined @WWLTV this morning to talk about what's ahead, including the urgent need for
permanent teacher pay raises.*, X (Apr. 14, 2025, at 16:05 CT),
https://x.com/RoyceDuplessis/status/1911888653242052890 (on file with the author);
Charles Lussier, *Louisiana senator set to start legislative process to form a St. George school
district,* THE ADVOCATE (Mar. 20, 2025), https://www.theadvocate.com/baton_rouge/news/
education/lawmaker-to-propose-laws-creating-st-george-school-district/article_6d66294e-58b0-
491d-b234-e5bad2f08a63.html (on file with the author) (quoting Sen. Rick Edmonds);
Tyler Bridges, *The Louisiana House voted to cut income and sales taxes. Then the math got in
the way*, THE TIMES PICAYUNE (June 2, 2025), https://www.nola.com/news/politics/louisiana-
senate-shelves-plans-to-cut-taxes-citing-cost/article_c7b1e0bb-df20-48ce-b992-
d795dd2f3eda.html (on file with the author) (quoting Sen. Franklin Foil);

Video posted by AN17, FACEBOOK, *Valarie Hodges for Louisiana State Senate - District 13 sees a lot of reason for optimism.* (Jan. 17, 2025), https://www.facebook.com/watch/?v=1780431449410076 (on file with the author); Mornings with Brian Haldane, *Caleb Kleinpeter*, TALK1073 (Aug. 29, 2024), https://talk1073.com/2024/08/29/mornings-with-brian-haldane-caleb-kleinpeter-08-29-24/ (on file with the author); Liam Combs, *State senator wants to allow political campaign signs in public school gyms, athletic fields*, WAFB9 (Mar. 5, 2025), https://www.wafb.com/2025/03/06/state-senator-wants-allow-political-campaign-signs-public-school-gyms-athletic-fields/ (on file with the author) (interviewing Sen. Eddie Lambert); *Voice of the People w/ Jay Luneau* (KALB5, Jan. 23, 2025), https://www.kalb.com/video/2025/01/23/voice-people-w-jay-luneau/ (on file with the author); *Sen. Blake Miguez talks La. Dept. of Government Efficiency*, (Action News 5, Jan. 17, 2025, at 07:14 CT), https://www.actionnews5.com/video/2025/01/18/sen-blake-miguez-talks-la-dept-government-efficiency/ (on file with the author); TONY PERKINS, *Thomas Pressly Discusses Louisiana State Legislation Regarding Abortion Pills* (YouTube, May 24, 2025), https://youtu.be/yPBd7grOhJs?si=ASlSvNRMpZrTxSSk (on file with the author); Piper Hutchinson, *Louisiana looks to RFK Jr. for school lunch guidelines, limits on SNAP purchases*, LA. ILLUMINATOR (Apr. 30, 2025, at 17:30 CT), https://lailluminator.com/2025/04/30/louisiana-looks-to-rfk-jr-for-school-lunch-guidelines-limits-on-snap-purchases/ (on file with the author) (quoting Sen. Patrick McMath); Wesley Muller, *Louisiana state employees could lose jobs under Civil Service amendment,* LA. ILLUMINATOR (June 5, 2025, at 18:38 CT), https://lailluminator.com/2025/06/05/civil-service-amendment/ (on file with the author) (quoting Sen. Jay Morris); KATC, *Full Interview: Rep. Brach Myers* (YouTube, Jan. 31, 2025), https://youtu.be/HF4GcM9qum4?si=4KvGNfUFYB7E7nUn (on file with the author) (erroneously referring to Sen. Myers as Rep. Myers); Julie O'Donoghue, *Republicans, Democrats submit competing Louisiana Senate district maps*, LA. ILLUMINATOR (Feb. 2, 2022, at 22:08 CT), https://lailluminator.com/2022/02/02/republicans-democrats-submit-competing-louisiana-senate-district-maps/ (on file with the author) (quoting Sen. Edward Price); LA. PUBLIC BROADCASTING, *State Senator Mike Reese | Louisiana Water Sector Commission | Press Club |* (YouTube, Mar. 24, 2025), https://youtu.be/LakcSYQ4Ccw?si=ttdPfK-ZhgmFzQAN (on file with the author); KTBS 3 NEWS, *The APP – State Senator Alan Seabaugh* (YouTube, Apr. 15, 2025), https://www.youtube.com/watch?v=b0grtlKy5fk (on file with the author); LA. PUBLIC BROADCASTING, *Jeremy Stine | State Senator from Lake Charles | Press Club |* (YouTube, Aug. 22, 2022), https://www.youtube.com/live/fc_wbUrIOqo?si=aHduzfKOLAHy-NgG (on file with the author); WWLV, *Sen. Kirk Talbot on insurance and tax reform bill proposals in Louisiana* (YouTube, Apr. 16, 2025), https://youtu.be/tt0wt99IJ84?si=ne0VY43Pb45Ztzjj (on file with the author).

In describing whether an official's speech on social media is official or personal, the *Lindke* Court described various factors and instances that indicate whether a defendant is speaking in her official capacity.[11] In an offline setting, for example, it would be clear that an official would be speaking in her official capacity when announcing the lifting of restrictions at an official meeting. *See Lindke,* 601 U.S. at 201-02. Conversely, relaying that same message at a family barbeque would clearly be private speech. *Id*. On social media, official speech can be determined by the presence of labels such as "official account," or whether an individual post specifically invokes state authority. *Id*. These examples are buttressed by this Court's own determinations of when official speech occurs. Specifically, speech need not be explicitly required by an official's job duties to be considered spoken in one's official capacity. *See Nixon v. City of Houston*, 511 F.3d 494, 498-99 (5th Cir. 2007). Instead, speech is official when it is undertaken in the course of performing one's job. *Id*.

In *Nixon v. City of Houston*, this Court determined that a police officer spoke in his official capacity when giving an interview to the media because, in part, he spoke while he was on duty, in uniform, and because it was intended to inform the

---

[11] This analysis applies prong two of the *Lindke* test (which analyzes the context of the speech of an official's social media page to discern whether they purported to use authority). The lower court did not consider this prong, and this issue is not on appeal before this Court. However, this analysis is necessary for analyzing custom as described in *Lindke.*

public of the job responsibilities he was fulfilling at that time. *See id*. at 498-99. In another case, this Court determined an athletic director had written memoranda as part of performing his job because they were written from the perspective of his position, rather than as a private citizen, because it employed special knowledge he had, and because it was about the program that he ran. *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007).

In surveying the communicative actions (such as social media, community outreach, and interviews) of Louisiana senators over the past few years, it is clear that 35 out of 38 current Louisiana senators met the factors outlined in *Lindke*, *Nixon*, or *Dall. Indep. Sch. Dist.* through some speech act. *See supra* nn. 6-10. Specifically, 24 senators have done so over social media, 13 via community outreach, and 24 through interviews or giving comment for news articles. *See supra* nn. 6-10. In doing so, they regularly cloak themselves in their offices' authority, including their official titles, and speak on matters within their bailiwick as state representatives, such as voting on or proposing legislation. *See id*. As such, almost every current Louisiana senator has spoken in an official capacity and thus has purported to do so as articulated in *Lindke*. Moreover, the Louisiana Legislature has, through its communications office, specifically stated that the job of a legislator is to "provide

information about state programs, current law and pending legislation," which satisfies the *Lindke* requirement that the official's authority to speak be recognized.[12]

This Court should find that Louisiana legislators purport to speak on the state's behalf with high regularity and that the state has recognized their ability to do so. As such, Defendant also exercised actual authority through long-established custom.

### D. Defendant's Authority to Speak Encompasses Speech Made Online.

Because Defendant has actual authority to speak on behalf of the State generally, this authority also extends to her speech online.  *See Garnier*, 136 F.4th at 1181. This is supported by Supreme Court jurisprudence regarding public discourse on the Internet and First Amendment protections for Internet speech in general, as well as by common sense.

As early as 1997, the Supreme Court has affirmed that the Internet functions as the modern public square, where "[t]hrough the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox" and "[t]hrough the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." *Reno v. Am. C.L. Union*, 521 U.S. 844, 870-71 (1997).

---

[12] LOUISIANA LEGISLATURE, *Information and Activity Book 7,* *https://lco.legis.la.gov/docs/Legislator.pdf* (on file with the author)

The Supreme Court has also recognized Twitter's special role as a modern public square because it specifically allows users to "petition their elected representatives and otherwise engage with them in a direct manner." *Packingham v. North Carolina*, 582 U.S. 98, 104-05 (2017). Indeed, the Supreme Court has acknowledged that numerous elected officials regularly communicate with the public using Twitter, as "[g]overnors in all 50 States and almost every Member of Congress have set up accounts [on Twitter] for this purpose." *Id*. at 105. While social media may be a comparatively new forum when examined in the context of traditional public forums such as sidewalks, streets, or public parks, "[t]hese websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

The district court erred when it held that Plaintiffs failed to establish or show custom for "*Louisiana* legislators customarily use Twitter to speak for the State." ROA.2195 (emphasis in original). This is a far more demanding application of custom than *Lindke* requires, as the Court instructs that "if an official has authority to speak for the State, he may have the authority to do so on social media even if the law does not make that explicit." 601 U.S. at 201.

The standard set by the Supreme Court is not one of whether an official can speak on one social media platform as opposed to another— the standard is whether the official has the actual authority, from the government, to speak. Defendant has

such authority, which encompasses the authority so communicate with the public on social media.

## CONCLUSION

The district court erred in concluding that Defendant did not possess actual authority to speak on behalf of the state. Its too-narrow reading of both written law and custom directly contravenes the Supreme Court's guidance in *Lindke* and will lead to absurd and anti-democratic results if affirmed by this Court.

Louisiana legislators possess actual authority to speak on legislative matters. This authority is derived from the Louisiana Constitution and Louisiana's structure as a representative democracy broadly. This authority is also derived from long-established custom of state senators purporting to speak on behalf of the state. This authority extends to Defendant's speech online. For the foregoing reasons, Plaintiffs respectfully request that this honorable Court reverse the district court's order dismissing Plaintiffs' case on summary judgment.

Respectfully submitted,

*/s/Anna Cleveland*
Bruce Hamilton, La Bar No. 33170
Annie Cleveland, La Bar No. 41473
Hallie Feinmann, student attorney
Samuel Montanari, student attorney
Henry Solotaroff-Webber, student attorney
Tulane First Amendment Clinic
6329 Freret Street, Suite 130
New Orleans, La 70118
bhamilton1@tulane.edu
acleveland@tulane.edu
o: (504)862-8813

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on November 10, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/Anna Cleveland*
Annie Cleveland, Counsel for Plaintiffs

34

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of FED. R. APP. P. 32(A)(7)(B) because:

    - this brief contains 8,103 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.  This brief also complies with the typeface requirements of FED. R. APP. P. 32(A)(5) and the type requirements of FED. R. APP. P. 32(A)(6) because:
    - this brief has been prepared in a proportionally spaced typeface using Microsoft Word with a 14-point font named Times New Roman.

              /s/ *Anna Cleveland*
              Annie Cleveland
              Counsel of Record for Plaintiff-Appellant