No. 25-30514

# In the United States Court of Appeals for the Fifth Circuit

MAYA DETIEGE; DAYNE SHERMAN,
*Plaintiffs-Appellants*

v.

KATRINA R. JACKSON,
*Defendant-Appellee*

On Appeal from the United States District Court
for the Western District of Louisiana
No. 3:23-cv-0175, Hon. Donald E. Walter

**APPELLEE'S RESPONSE BRIEF**

*(Counsel listed on inside cover)*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General
CAITLIN HUETTEMANN
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
HuettemannC@ag.louisiana.gov

Thomas M. Hayes, IV
HAMMONDS, SILLS, ADKINS,
GUICE, NOAH & PERKINS, L.L.P.
1500 N. 19th Street, Suite 301
Monroe, Louisiana 71201
Telephone: (318) 324-0101
Facsimile: (318) 322-5375
thayes4@hamsil.com

ii

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellee—as a "governmental" party—need not furnish a certificate of interested persons.

/s/ Caitlin Huettemann
CAITLIN HUETTEMANN

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants requested oral argument, and, although affirmance is plainly warranted, Senator Jackson does not oppose that request.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................... iii

STATEMENT REGARDING ORAL ARGUMENT .............................. iv

TABLE OF AUTHORITIES ................................................................ vii

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 4

ISSUES PRESENTED ......................................................................... 5

STATEMENT OF THE CASE ............................................................. 6

    A.   THE SUPREME COURT'S *LINDKE* DECISION SETS THE GOVERNING STANDARD ........................................................... 6

    B.   SENATOR JACKSON'S TWITTER ACCOUNT ......................... 9

    C.   SENATOR JACKSON BLOCKS DETIEGE FOLLOWING A RACIST AND PROFANE ATTACK ................................................ 13

    D.   SENATOR JACKSON PURPORTEDLY BLOCKS SHERMAN A DECADE EARLIER .................................................................. 16

    E.   PLAINTIFFS FILE SUIT UNDER SECTION 1983 ............... 17

SUMMARY OF ARGUMENT .............................................................. 20

LEGAL STANDARD ........................................................................... 22

ARGUMENT ....................................................................................... 24

I.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIMS ON THEIR MERITS. ........................................................... 24

A. Plaintiffs Have No Cause of Action Under Section 1983. .......24

    1. Plaintiffs fail *Lindke* step one because Senator Jackson lacks authority to speak for the State................24

    2. Plaintiffs fail *Lindke* step two because Senator Jackson did not purport to exercise the State's authority in the relevant posts.........................30

B. Senator Jackson Did Not Violate Plaintiffs' First Amendment Rights.........................................33

II. THE DISTRICT COURT LACKED JURISDICTION.................................36

A. Sherman Lacks Article III Standing........................................36

B. Sherman's Claims Are Time-Barred. ....................................41

C. Plaintiffs' Claims Are Barred in Their Entirety by Senator Jackson's Immunity.................................................44

    1. Qualified immunity independently bars the individual-capacity claims.............................................44

    2. On Plaintiffs' theory, the Eleventh Amendment bars the claims................................................50

    3. On Plaintiffs' theory, legislative immunity independently bars the official- and individual-capacity claims.................................................51

CONCLUSION .................................................................52

CERTIFICATE OF SERVICE ............................................54

CERTIFICATE OF COMPLIANCE....................................55

# TABLE OF AUTHORITIES

**Cases**

*Attwood v. Clemons,*
818 F. App'x 863 (11th Cir. 2020)......................................................49

*Brown v. Pouncy,*
93 F.4th 331 (5th Cir. 2024) ............................................................41

*City of Austin v. Paxton,*
943 F.3d 993 (5th Cir. 2019) ...........................................................23

*Cole v. Gray,*
638 F.2d 804 (5th Cir. 1981).............................................................30

*Cozzo v. Tangipahoa Par. Council—President Gov't,*
279 F.3d 273 (5th Cir. 2002)............................................................23

*Cunningham v. Castloo,*
983 F.3d 185 (5th Cir. 2020)............................................................47

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022).........................................................................13

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024).................................................................*passim*

*Freedom From Religion Found. v. Abbott,*
955 F.3d 417 (5th Cir. 2020).....................................................34, 35

*Garcetti v. Ceballos,*
547 U.S. 410 (2006)...........................................................................7

*Garnier v. O'Connor-Ratcliff,*
136 F.4th 1181 (9th Cir. 2025) .......................................................27

*Graham v. Hamilton,*
872 F. Supp. 2d 529 (W.D. La. 2012)..............................................43

*Hall v. Louisiana,*
974 F. Supp. 2d 944 (M.D. La. 2013)..............................................50

*Hearn v. McCraw,*
856 F. App'x 493 (5th Cir. 2021)................................................42, 43

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ....................................................................35

*In re Air Crash at Dallas/Fort Worth Airport on Aug. 2, 1985,*
861 F.2d 814 (5th Cir. 1988) ...............................................22, 23

*Jackson v. Am. Bankers Ins.,*
2006 WL 8456128 (E.D. La. Sept. 12, 2006) ...........................42

*Kallinen v. Newman,*
2023 WL 2645555 (5th Cir. Mar. 27, 2023) ............................47

*Lane v. Franks,*
573 U.S. 228 (2014) .....................................................................8

*Lindke v. Freed,*
601 U.S. 187 (2024) ...........................................................*passim*

*Little v. Liquid Air Corp.,*
37 F.3d 1069 (5th Cir.1994) .....................................................23

*McClelland v. Katy Indep. Sch. Dist.,*
63 F.4th 996 (5th Cir. 2023) ....................................................46

*Mitchell v. Wackenhut Corr.,*
224 F.3d 765 (5th Cir. 2000) ...................................................23

*Murthy v. Missouri,*
603 U.S. 43 (2024) ..............................................................36, 38

*Packingham v. North Carolina,*
582 U.S. 98 (2017) .....................................................................48

*Pearson v. Callahan,*
555 U.S. 223 (2009) ...................................................................44

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) .....................................................................50

*Ramirez v. Escajeda,*
44 F.4th 287 (5th Cir. 2022) .........................................44, 45, 46

*Robinson v. Hunt Cnty.,*
921 F.3d 440 (5th Cir. 2019) ..............................................47, 48

*Roe v. Wade,*
410 U.S. 113 (1973) ...................................................................13

*Royal Canin U.S.A., Inc. v. Wullschleger,*
604 U.S. 22 (2025) ....................................................................40

*Strong v. Green Tree Servicing, LLC,*
2016 WL 4095597 (N.D. Tex. Aug. 1, 2016) ........................................43

*Walker v. Schult,*
45 F.4th 598 (2d Cir. 2022) ..........................................................45

*Walker v. United States,*
2008 WL 2641334 (W.D. La. July 1, 2008) ..........................................43

*West v. Atkins,*
487 U.S. 42 (1988) ....................................................................31

*Will v. Mich. Dep't of State Police,*
491 U.S. 58 (1989) ....................................................................50

*Williams v. United States,*
71 F.3d 502 (5th Cir. 1995) ..........................................................28

## Statutes

28 U.S.C. § 1331 .......................................................................4

42 U.S.C. § 1983 .................................................................. passim

La. R.S. 40:1061 *et seq.* ............................................................13

## Other Authorities

2022 La. Sess. Law Serv. Act 545 ....................................................13

2024 La. Sess. Law Serv. Act 423 ....................................................41

La. Const. Ann. art. III, § 1(B) ...............................................25, 26

## Rules

Fed. R. Civ. P. 56(e) .................................................................23

Fed. R. Civ. P. 8(c)(1) ...............................................................42

## INTRODUCTION

Plaintiff Maya Detiege used her Twitter account to tell Senator Katrina Jackson, "with all disrespect," to "burn in hell." *See* ROA.697. Detiege told Senator Jackson that she was "rooting for [her] downfall." *Id.* And she added: "I do not support all black women. Some of you bitches are very dumb." *Id.* Reasonably, appropriately, and swiftly, Senator Jackson blocked Plaintiff Detiege on Twitter to stop such abhorrent tweets from flooding her Twitter account. That decision does not violate the First Amendment, and, more fundamentally, cannot support a claim under 42 U.S.C. § 1983 because there is no state action: Senator Jackson was not speaking for the State when she chose to clear her page of vitriol. By failing to clear that vital first hurdle, Plaintiffs failed to state a claim, and the district court correctly dismissed their lawsuit in its entirety on summary judgment. Plaintiffs provide no basis to depart from that sound ruling, and this Court should affirm.

Plaintiffs jump the gun from page one of their introduction by turning to "bedrock principle[s] of First Amendment jurisprudence" without acknowledging up front that they fail the threshold question: whether the defendant sued under § 1983 constitutes a state actor who

1

*can* be sued under that statute. *See* Op. Br. 2. The district court here got it right: Plaintiffs cannot—and certainly did not—establish that Senator Jackson possessed actual authority to speak on behalf of the State on her Twitter account. *See* ROA.2209. That is so based on a lack of both written law and longstanding custom across Louisiana, and follows naturally from the Supreme Court's decision in *Lindke v. Freed*, 601 U.S. 187 (2024). This Court need do no more than affirm on that simple fact.

If that were not enough (though they forfeit the issue in their opening brief), Plaintiffs likewise fail step two of the *Lindke* analysis because Senator Jackson was not purporting to exercise any State authority when she blocked Plaintiffs on Twitter. Even more, Plaintiffs fail the First Amendment analysis outright, putting the nail in the coffin of their merits arguments. This Court can affirm on these facts, too.

Although the district court proceeded directly to the merits and did not address Senator Jackson's arguments concerning the court's jurisdiction, the jurisdictional bars raised below provide yet another independent basis to affirm judgment in the Senator's favor. This lawsuit was frivolous the day it was filed—for Detiege plainly had no viable First Amendment claims against Senator Jackson, and, even if she did,

Eleventh Amendment immunity, legislative immunity, and qualified immunity all combine to bar those claims without even reaching the merits. This lawsuit became even more frivolous when Detiege's counsel filed an Amended Complaint adding Plaintiff Dayne Sherman—a Twitter user who (a) claims to have been blocked a decade ago by Senator Jackson but was not blocked when he joined the suit (a claim barred by the one-year limitations period) and (b) has openly testified that the only "relief" he seeks is new First Amendment precedent (which means he has no Article III standing). This Court—on any and all of these bases—can therefore affirm the district court's judgment below without ever reaching the merits.

What the jurisdictional flaws and one-sided merits analysis point up is that this case does not warrant a second look by this Court. The district court properly concluded that Plaintiffs could not establish an essential element of their claims—and that is only the tip of the iceberg. The Court should affirm.

## JURISDICTIONAL STATEMENT

The district court has federal-question jurisdiction over Plaintiffs' 42 U.S.C. § 1983 action under 28 U.S.C. § 1331, although Senator Jackson challenged the district court's Article III jurisdiction, *see infra* Section II. The district court entered the Memorandum Ruling and Judgment at issue in this appeal on August 15, 2025. ROA.2194–211. Plaintiffs timely filed their notice of appeal on September 12, 2025. ROA.2316.

# ISSUES PRESENTED

1. Whether the district court correctly found that Senator Jackson's actions on Twitter did not constitute state authority under *Lindke* where Senator Jackson lacked actual authority to speak for the State and did not purport to exercise any such authority when blocking vitriol from her page.

2. Whether Plaintiffs failed to establish a violation of their First Amendment rights.

3. Whether the district court lacked jurisdiction to hear Plaintiffs' claims against Senator Jackson where Article III standing, the statute of limitations, the Eleventh Amendment, legislative immunity, and qualified immunity all independently bar relief.

## STATEMENT OF THE CASE

### A. The Supreme Court's *Lindke* Decision Sets the Governing Standard

As both the parties and the district court agree, the Supreme Court's recent decision in *Lindke* dictates the outcome in this case. There, Kevin Lindke commented on the public Facebook page of James Freed, the city manager of Port Huron, Michigan, regarding the city's response to the COVID-19 pandemic. 601 U.S. at 191–93. Lindke expressed his belief that the city's pandemic response was "abysmal" and that "the city deserves better." *Id.* at 193. In response, Freed deleted Lindke's comments and later blocked Lindke from his Facebook page. *Id.* As a result, Lindke, like Plaintiffs here, sued Freed under § 1983, alleging that Freed violated his First Amendment rights. *See id.*

When Lindke's case reached the Supreme Court, the sole issue presented was the threshold cause-of-action question: whether, in deleting Lindke's comments and blocking him, Freed engaged in "state action" that implicates the § 1983 cause of action. The Supreme Court acknowledged a circuit split on the issue of "state action in the social-media context" and thus clarified the appropriate test. *Id.* at 194.

The Court reiterated that "state action" is an essential element of any § 1983 claim—and as such, § 1983 only "protects against acts attributable to a State, not those of a private person." *Id.* Next, the Court noted that, on occasion, "the line between private conduct and state action is difficult to draw." *Id.* And the question can be especially difficult "in a case involving a state or local official who routinely interacts with the public." *Id.* at 196. Because "[s]uch officials may look like they are always on the clock," it is "tempting to characterize every encounter as part of the job." *Id.* However, "such broad-brush assumptions" are improper: "While public officials can act on behalf of the State, they are also private citizens with their own constitutional rights." *Id.*

Underscoring this dichotomy, the Supreme Court emphasized that Freed, as a public official, "did not relinquish his First Amendment rights when he became city manager." *Id.* Rather, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 196–97 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). "This right includes the ability to speak about 'information related to or learned through public employment,' so long as the speech is not 'itself ordinarily within the

scope of [the] employee's duties.'" *Id.* at 197 (quoting *Lane v. Franks*, 573 U.S. 228, 236 (2014)).

Taking these principles together, the Supreme Court held that state officials' conduct constitutes state action on social media *only if* (1) the official "possessed actual authority to speak on the State's behalf," and (2) the official "purported to exercise that authority when [they] spoke on social media." *Id.* at 198. "The appearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first"—in other words, a failure to prove step one is fatal to a plaintiff's § 1983 claim. *Id.* The Supreme Court further emphasized that "the state-action doctrine demands a fact-intensive inquiry," especially in the context of social media where "the line [between personal and official communication] is often blurred." *Id.* at 197. Finally, in summarizing its opinion, the Supreme Court underscored that this analysis turns on the specific subject and posts in question: "The state-action doctrine requires Lindke to show that Freed (1) had *actual authority* to speak on behalf of the State on a particular matter, and (2) purported to exercise that authority *in the relevant posts*." *Id.* at 204 (emphases added).

## B. Senator Jackson's Twitter Account

Senator Katrina Jackson is a black Democrat who currently represents Louisiana's 34th District in the Louisiana Senate. ROA.483; ROA.495; ROA.518. Like millions worldwide, Senator Jackson has an account (@KatrinaRJackson) on "Twitter," now known as "X," which she has maintained since 2012. ROA.518–19. Her Twitter account is accessible to other Twitter users, and as with any Twitter account, any Twitter user may "follow" her, "like" her "tweets," "reply" to those tweets, and "re-tweet" them to share with their own followers. *See* ROA.93; *accord* ROA.515.

Her account, unequivocally, is her own "personal page." ROA.521; ROA.513 ("My Twitter is my, like, personal page."). The "only Senate page" she has is a Facebook page. ROA.513; *id.* ("The only account that is ... designated for the Senate is that Senate Facebook account."). And her personal Twitter account is likewise distinct from the House and Senate Twitter accounts, which "officially speak[] for the House or the Senate." ROA.512; *id.* ("We don't control the House or the Senate social media accounts nor can we post on them."); ROA.537 ("[T]he [House] and the Senate have those official Twitter pages that speak for the State

Senate and the State House."). When she originally created her account, she intended for the account to "update [users] daily" on legislative activities. ROA.519. But she later realized that this was overly "ambitious," and concluded that her "personal life needs to be, you know, personal." *Id.*; *see id.* ("never followed through with" original plan and instead "began to redirect everyone to the office"). Senator Jackson also writes "all of [her] tweets." ROA.531.

Unsurprisingly, therefore, Senator Jackson's Twitter account looks like a personal account: At the time of the filings below, her wedding picture was her profile picture (and it remains a picture of her and her husband to the present day); her cover picture shows her surrounded by family and friends; and (in the example below) a recent post is a call to church:



ROA.691. Her account also has a link to her website, katrinarjackson.com, which "[u]nfortunately" has "nothing current" and was "probably" linked in 2012 when the Senator originally intended to update users on legislative activities. ROA.527; *see* ROA.529 ("this website was last changed three years ago because of having one staffer it became too much").

Her posts, too, are generally personal. For example, she might tweet about her wedding rehearsal and rehearsal dinner, or an inspirational message, or an honor her nephew received:







ROA.701; ROA.727; ROA.725.

At the same time, Senator Jackson has used her Twitter account to urge users to contact their senators to vote "yes" or "no" on certain bills. *E.g.*, ROA.536; ROA.537. Similarly, the Senator has tweeted links so that users could "watch" legislative hearings, *e.g.*, ROA.540–41, ROA.543, and alerted users about hearings where "public testimony was welcome," ROA.542. But overall, Senator Jackson "[a]bsolutely" does not "find

Twitter useful." ROA.520. She "sometimes for days forget[s] [she has] Twitter." ROA.510. And especially as to "interact[ions] with other Twitter users on matters relating to the legislature and politics," she engages in those interactions "[v]ery infrequently." ROA.525.

### C. Senator Jackson Blocks Detiege Following a Racist and Profane Attack

One of Senator Jackson's well-known public positions is that she is unapologetically pro-life. *E.g.*, ROA.501 (member of Democrats for Life). So, when the U.S. Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), Senator Jackson unsurprisingly spoke out about the abortion issue. Prior to *Dobbs*, Louisiana law reflected a set of abortion restrictions that would come into play if and when the Supreme Court overturned *Roe v. Wade*, 410 U.S. 113 (1973). *See* La. R.S. 40:1061 *et seq*. Senator Jackson authored an amendment to that law, which then-Governor Edwards signed one week before *Dobbs*. *See* 2022 La. Sess. Law Serv. Act 545.

In the wake of *Dobbs*, Senator Jackson published two tweets highlighting this Louisiana law as amended:



ROA.693; ROA.695.

Apparently infuriated by the Senator's posts, Plaintiff Maya Detiege attacked Senator Jackson. She operated under an anonymous username, with a profile picture that hid her face, and a profile that appears to be a fan page for a Seattle hockey player. In two responses, Detiege told Senator Jackson to "burn in hell," referred to the Senator as a "black" "bitch" who is "very dumb," and "root[ed] for [the Senator's] downfall."



ROA.697.

It turns out that Detiege lives in New Orleans and is not one of Senator Jackson's constituents. ROA.577. Senator Jackson immediately blocked Detiege. The Senator has blocked accounts that she believes are "fake" because they do not bear "a person's name," "identification

information," "pictures," or "any connectivity with Louisiana." ROA.547. She thus blocked Detiege "based on her derogatory comments" and because her account "looked like a fake created page." *Id.*; ROA.565 ("I remembered why I had blocked her."); *id.* ("nothing identifiable but hockey"); ROA.566 ("It was a hockey fan page from another state."). Because of her vitriol, Detiege remains blocked today.

Detiege testified in her deposition that she simply quoted a "meme" in calling Senator Jackson "black" and "dumb" and a "bitch." ROA.787. At the same time, however, she doubled down on the racist insult because she "thought that Senator Jackson was wrong." *Id.*

## D. Senator Jackson Purportedly Blocks Sherman a Decade Earlier

In a strange sideshow to this case, Plaintiff Dayne Sherman appeared for the first time in the Amended Complaint. Like Detiege, he is not one of Senator Jackson's constituents; he lives in Ponchatoula. And his story is puzzling, perhaps because he does not know when or why Senator Jackson supposedly blocked him. According to the Amended Complaint and his brief deposition testimony, he engaged with then-Representative Jackson in 2013 over the legality of a then-pending bill. ROA.95. And then, at some unspecified point in 2013, Senator Jackson

blocked him. ROA.752. Senator Jackson testified that she has no recollection of this, and Sherman has provided no evidence other than his say-so. *See* ROA.557 ("don't know if I blocked him"); ROA.569 ("don't remember if he was blocked").

But all this is irrelevant, because Sherman testified under oath that he was not blocked at the time he filed his claims in the Amended Complaint. ROA.753. He also disavowed seeking any relief in this case. Instead, what he "would really like to accomplish is to have [this case] settle law that elected officials and government agencies can't block American citizens on social media." ROA.759–60; ROA.760 (Q: "Are you looking to recover anything else?" A: "No.").

### E. Plaintiffs File Suit Under Section 1983

Detiege filed the original complaint in this suit, alleging a violation of her First Amendment rights under 42 U.S.C. § 1983 because of her inability to access Senator Jackson's Twitter page. ROA.16–17. On August 28, 2023, Sherman joined the lawsuit, asserting the same claim against Senator Jackson in her official- and individual-capacities. ROA.89–90. Both Plaintiffs generally sought a declaration that Senator Jackson's actions violated their rights under the First Amendment, an

injunction requiring Senator Jackson to unblock Detiege, an injunction preventing Senator Jackson from restricting their future access to her Twitter account, and an award of nominal damages not exceeding $20 against Jackson in her individual capacity. ROA.103–04; *but see* ROA.759 (Sherman stating, "I am not seeking monetary compensation.").

Following discovery, Plaintiffs and Senator Jackson filed cross-motions for summary judgment in January 2025. ROA.446–78 (Dist. Ct. ECF No. 50, Senator Jackson's Motion); ROA.802–51 (Dist. Ct. ECF Nos. 52-2, 52-3, & 58, Plaintiffs' Motion). In her motion for summary judgment, Senator Jackson argued at length that the district court must dismiss all claims contained in the Amended Complaint because five different jurisdictional bars—Article III standing, statute of limitations, the Eleventh Amendment, legislative immunity, and qualified immunity—prevented this suit from taking another step. *See* ROA.464–70. Even if Plaintiffs could clear those hurdles, however, Senator Jackson asserted that Plaintiffs have no viable First Amendment claim because (1) Senator Jackson did not engage in state action as defined by the Supreme Court in *Lindke,* and (2) Senator Jackson did not violate Plaintiffs' First Amendment rights. ROA.471–77.

On August 15, 2025, the district court granted Senator Jackson's motion for summary judgment and denied Plaintiffs' motion for summary judgment. ROA.2194–210 (Memorandum Ruling); ROA.2211 (Judgment). Agreeing with Senator Jackson that "Plaintiffs cannot establish state action," the district court dismissed all of Plaintiffs' claims against Senator Jackson with prejudice. ROA.2209.

On *Lindke* step one, the district court found that Plaintiffs "fail[ed] to demonstrate that [Senator] Jackson has 'actual authority rooted in written law or longstanding custom to speak for the State.'" ROA.2205 (quoting *Lindke*, 601 U.S. at 201). Emphasizing *Lindke*'s command that "the presence of state authority must be real, not a mirage," the court found that Plaintiffs' reliance on Senator Jackson's "use of her Twitter" and "deposition, statements she made about using social media, and tweets she posted" was improper. ROA.2206. Turning to the proper consideration—written law or longstanding custom and usage—the district court found that (1) "Plaintiffs' sources of written law do not demonstrate that [Senator] Jackson has authority to speak on the State's behalf," and (2) "Plaintiffs fail[ed] to demonstrate that longstanding custom or usage vests Louisiana legislators with authority to speak on

19

the State's behalf." ROA.2207; ROA.2208. Because "Plaintiffs' cited sources do not establish [Senator] Jackson had actual authority to speak on the State's behalf," the district court concluded that Plaintiffs failed an essential element of their claim and Senator Jackson was therefore entitled to judgment as a matter of law. ROA.2209. The district court saw no need to reach *Lindke* step two, nor did the district court address any of Senator Jackson's arguments regarding the many jurisdictional bars to Plaintiffs' suit. *See* ROA.2194–2210.

Plaintiffs appealed the district court's judgment on September 12, 2025. ROA.2316.

## SUMMARY OF ARGUMENT

**I.** This Court need do no more than affirm the district court's straightforward application of *Lindke* step one to dismiss Plaintiffs' claims. The district court correctly emphasized that Plaintiffs identified neither written law nor longstanding custom or usage by Louisiana state senators to establish actual authority for such senators to speak on behalf of the State. ROA.2205–08. That threshold showing, as the Supreme Court explained, is required to establish state action sufficient to bring a

defendant within the realm of § 1983. Without that necessary minimum, Plaintiffs' claims fail from the jump.

Though the district court didn't need to reach it (and though Plaintiffs declined to brief, and thus have forfeited, the issue before this Court), Plaintiffs also flunk *Lindke* step two, because Senator Jackson did not purport to exercise any State authority when she blocked Plaintiffs' vitriol from infecting her Twitter page. Failing both steps of *Lindke*, Plaintiffs simply cannot bring a claim against Senator Jackson under § 1983.

If that were not enough, Plaintiffs likewise fail to show a violation of the First Amendment at all, focusing heavily (at 3) on the "importance of First Amendment protections for Internet speech" without grappling with the specifics of the forum analysis. Rather than "creat[ing] a forum for civic participation," Senator Jackson's Twitter page is, at most, a nonpublic forum in which she is more than justified in narrow blocking to keep her Twitter account free of racism and profanity. *See* Op. Br. 4.

In sum, Plaintiffs' claims fail on their merits three times over—and this Court should affirm on any and all of those grounds.

**II.** Missing from the district court's ruling was any discussion of Senator Jackson's jurisdictional arguments. However, because such arguments show that the district court lacked jurisdiction over Plaintiffs' claims in all events, this Court can independently affirm on any one of those five bars.

As for Plaintiff Sherman, he lacks Article III standing, and his claims are plainly time-barred under the then-applicable one-year statute of limitations for § 1983 claims. And for both Plaintiffs, Senator Jackson's immunity—whether under the Eleventh Amendment, legislative immunity, or qualified immunity—prevents their claims from proceeding. This Court can therefore affirm dismissal of Plaintiffs' claims across the board because they never should have been filed in the first place.

## LEGAL STANDARD

"In reviewing a summary judgment," this Court applies the Rule 56(c) "summary judgment standard *de novo* and ask[s] whether there are no questions of material fact such that the movant is entitled to judgment as a matter of law." *In re Air Crash at Dallas/Fort Worth Airport on Aug. 2, 1985*, 861 F.2d 814, 815–16 (5th Cir. 1988). "Summary judgment is

proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mitchell v. Wackenhut Corr.*, 224 F.3d 765, 765 (5th Cir. 2000) (per curiam). "If the moving party meets the initial burden of showing that there is no genuine issue, the burden shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)). "The nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)). Further, "[s]ome deference is due to the district court's interpretations of the law of the state in which it sits." *In re Air Crash*, 861 F.2d at 816.

This Court examines jurisdictional issues, such as sovereign immunity, *de novo. City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). Moreover, "a lack of subject matter jurisdiction may be raised at any time." *Cozzo v. Tangipahoa Par. Council—President Gov't*, 279 F.3d 273, 280 (5th Cir. 2002) (citation modified).

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIMS ON THEIR MERITS.

As the district court correctly determined, Plaintiffs' § 1983 claims against Senator Jackson cannot succeed under controlling precedent, for at least two reasons. *First*, they have no cause of action under § 1983 because Senator Jackson did not engage in state action as defined by the Supreme Court in *Lindke*. *Second*, and in any event, Senator Jackson did not violate Plaintiffs' First Amendment rights.

### A. Plaintiffs Have No Cause of Action Under Section 1983.

The district court correctly declined to reach the merits of the First Amendment issue raised in Plaintiffs' complaint because Plaintiffs lack any cause of action to begin with under *Lindke*. This Court should affirm that reasoning, which abides by the governing standard articulated by the Supreme Court in *Lindke*. *See supra* pp.6–8.

#### 1. Plaintiffs fail *Lindke* step one because Senator Jackson lacks authority to speak for the State.

The *Lindke* test is easily applied here—and, as the district court held below, step one resolves the issue: No state action exists (and thus, Plaintiffs have no cause of action under *Lindke*) because Senator Jackson had no "actual authority to speak on behalf of the State on a particular

matter" in the relevant posts. 601 U.S. at 204. The Supreme Court clarified that "actual authority" here hearkens back to the "potential sources" listed in § 1983—"statute, ordinance, regulation, custom, or usage." *Id.* at 200. That is where "the power [must] come from." *Id.*; *see id.* at 198 ("An act is not attributable to a State unless it is traceable to the State's power or authority."). Put otherwise, "[i]f the State did not entrust [Senator Jackson] with [publishing her posts], it cannot 'fairly be blamed' for the way [she did so]." *Id.* at 199.

Here, no statute, ordinance, or other source of law empowers a senator to speak for the State, through social media or otherwise. Plaintiffs still have not pointed to a single law that allows State senators to speak *on behalf of the State.* As the Louisiana Constitution explains, the Legislature acts as a body. *See* La. Const. Ann. art. III, § 1(B) ("The legislature is a continuous body during the term for which its members are elected."). The district court did not err in rejecting Plaintiffs' "plethora" of purported authority (nor did the district court ignore Plaintiffs' cited rules, *compare* Op. Br. 16–17, *with* ROA.2207), which

25

plainly do not grant this unique power to speak on behalf of the State itself to state senators. ROA.2205–07.

Even accepting Plaintiffs' narrow view (at 13) of the term "state" in *Lindke* as encompassing the Legislature alone, Plaintiffs do not identify any statute, rule, or procedure that permits an individual state senator to speak on the *Legislature's* behalf either. Again, the Legislature itself acts—and speaks—as a body, not via individual members. *See* La. Const. Ann. art. III, § 1(B). Plaintiffs' generalized assumption that any state official "may speak for their respective governmental units when using official channels" would expand *Lindke* well beyond its bounds by equating merely "holding office" with "possessing authority to speak for the official body." *See* Op. Br. 14. In other words, Plaintiffs' conception of *Lindke* would devour the rule. As the district court noted, "legislators are tasked with proposing and voting on legislation"—no more, no less. ROA.2207. And Plaintiffs have no basis to suggest "that 'making official announcements [about legislative matters] is *actually* part of the job that the State entrusted the official to do.'" *Id.* (quoting *Lindke*, 601 U.S. at

26

201). That is clearly not the case here, and the district court was right to reject Plaintiffs' contrary point of view.

Plaintiffs' citation (Op. Br. 17) of *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181 (9th Cir. 2025), is inapposite. There, the Ninth Circuit found explicit written law—in the form of both statute and the board's by-laws—granting board members the duty to communicate information to their public. *Id.* at 1188–89. "At a minimum," the Ninth Circuit found, the by-laws "establish[] that [] Board members are authorized to communicate certain official, sanctioned information and materials authored by the Board or the Superintendent" and that the defendant Board president specifically was "a person authorized to share information with the community." *Id.* at 1189. In contrast, Plaintiffs here can only point to general provisions explaining the role of the Legislature and legislators in the State. Op. Br. 19. None of those cited provisions grants authority to individual legislators to speak *on the State's behalf* (or even on behalf of *the Legislature as a whole*). Whether those legislators can speak for themselves alone is irrelevant, as is prior precedent from this Court recognizing that legislators generally should

27

communicate with the public. *Contra* Op. Br. at 21 (citing *Williams v. United States*, 71 F.3d 502 (5th Cir. 1995)).[1]

Nor do Plaintiffs get anywhere by claiming that there is some sort of "custom or usage" pursuant to which senators speak on the State's behalf. For one thing, no such evidence appears in the deposition transcripts. Even if it did, the district court was correct that Senator Jackson's use of Twitter alone cannot establish a "custom." ROA.2206. For another, Plaintiffs would have to show that, for example, prior senators "have purported to speak on [the State's] behalf and have been recognized to have that authority for so long that [their] power to do so has become 'permanent and well settled.'" *Lindke*, 601 U.S. at 200; *see id.* at 201 ("longstanding custom to speak for the State"). It would be preposterous to suggest that any such permanent and well-settled custom exists. And for yet another thing, that the Louisiana Senate and House chambers have their own Twitter accounts—which speak for those

---

[1] This Court's decision in *Williams* is likewise inapposite. There, the Court found that U.S. Congressman Jack Brooks "was acting within the scope of his employment *for purposes of the Westfall Act* at the time he allegedly made defamatory statements." 71 F.3d at 504 (emphasis added). The Court, of course, did not discuss *Lindke*—because the opinion predates *Lindke* by almost 30 years—nor did it even address § 1983 at all—because the lawsuit wasn't brought under that provision. *See id.* The Court should reject Plaintiffs' attempt to cobble together distinguishable precedent with the new, controlling test outlined in *Lindke*.

bodies and which individual members are not permitted to operate—reinforces that there is no custom establishing that a senator may speak for the Legislature, much less for the State itself. *See* ROA.512 ("We don't control the House or the Senate social media accounts nor can we post on them."); ROA.537 ("[T]he [House] and the Senate have those official Twitter pages that speak for the State Senate and the State House."); *see also* ROA.2207–08 (quoting Plaintiffs' cited article for proposition that over 40% of House members and 36% of Senate members have not tweeted at all this year).

Plaintiffs' attempt to reverse tack and analyze custom through the much broader lens of legislators' overarching use of "some communicative means" "both on and offline" to speak "in an official capacity" (at 24, 25) is puzzling and, in all events, incorrect. The appropriate context here is social media itself, and whether there is a longstanding custom or usage by *Louisiana* legislators of Twitter sufficient to establish actual authority to speak for the State via those means. *See* ROA.2207. There is not, and

references to other types of speech or other types of state officials get Plaintiffs nowhere.

Plaintiffs seem to suggest that this Court can skip this threshold question and proceed "immediately to determining whether there was an actual deprivation of rights, rather than whether such an act constituted state action." Op. Br. 22 (citing *Cole v. Gray*, 638 F.2d 804, 811 (5th Cir. 1981)). If that truncated analysis were appropriate before (it is not clear that it was), it certainly would be improper post-*Lindke*. While the burden on *Lindke*'s step one can (by design) be difficult to meet, it is in no way "insurmountable." Op. Br. 17. Here, Plaintiffs simply did not point to any evidence of "actual authority rooted in written law or longstanding custom to speak for the State," *Lindke*, 601 U.S. at 201, and so the Court's analysis can and should end at step one.

### 2. Plaintiffs fail *Lindke* step two because Senator Jackson did not purport to exercise the State's authority in the relevant posts.

Even if Senator Jackson had authority to speak for the State, she did not purport to exercise State-sanctioned authority while speaking on Twitter here. "State officials have a choice about the capacity in which they choose to speak." *Id.* And a public official chooses to speak on the

State's behalf only "while speaking 'in [her] official capacity or' when [she] uses [her] speech to fulfill '[her] responsibilities pursuant to state law.'" *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 50 (1988)). Where "the public employee does not use [her] speech in furtherance of [her] official responsibilities, [she] is speaking in [her] own voice." *Id.* Context matters at step two—and it is dispositive here—even if neither the district court nor Plaintiffs addressed it.

*First*, Senator Jackson's Twitter account is unequivocally her "personal page," ROA.521; it is not an official page for the State, the Louisiana Senate, or even the 34th District. To be sure, it does not bear a "this is a personal page" label. *Lindke*, 601 U.S. at 202. But any reasonable observer of the Senator's repeated personal posts and inspirational messages—together with her profile and cover photos— would recognize that this is a personal page. *See supra* pp.9–12; *see, e.g.*, ROA.700–39. And that is enough to "safely presume" that speech on her Twitter account "is personal (absent significant evidence indicating that a post is official)." *Lindke*, 601 U.S. at 202.

*Second*, Plaintiffs at most claimed below that Senator Jackson's Twitter page is "mixed use"—"a place where [she] made some posts in

31

[her] personal capacity and others in [her] capacity as" state senator. *Id.* But that would require Plaintiffs to categorize the posts at issue via "a fact-specific undertaking in which the post's content and function are the most important considerations." *Id.* at 203. Importantly, "[h]ard-to-classify cases require awareness that an official does not necessarily purport to exercise his authority simply by posting about a matter within it." *Id.*

In this case, however, that classification exercise is easy. The abortion-law posts that triggered Detiege's racist and profane assault on Senator Jackson (and thus the block on Detiege) unquestionably did not purport to exercise the State's authority. They simply highlighted existing Louisiana law—something the Supreme Court expressly noted is insufficient to constitute state action. *See id.* ("If, by contrast, the mayor merely repeats or shares otherwise available information—for example, by linking to the parking announcement on the city's webpage—it is far less likely that he is purporting to exercise the power of his office."). In this way, Senator Jackson was no different than a hypothetical school board president who, "at a backyard barbecue with friends whose children attend public schools, [] shares that the board has

lifted [] pandemic-era restrictions." *Id.* at 201. Just as that is a "private action taken in his personal capacity as a friend and neighbor," *id.* at 202, so too Senator Jackson's observation about existing Louisiana law was private action taken in her personal capacity.

Because Senator Jackson lacked authority to speak on the State's behalf, and at the very least did not purport to exercise any such authority, Plaintiffs have no cause of action under § 1983, and the district court correctly found that Senator Jackson is entitled to judgment as a matter of law on Plaintiffs' claims. That decision should be affirmed.

## B. Senator Jackson Did Not Violate Plaintiffs' First Amendment Rights.

The Court need go no further to affirm the dismissal of Plaintiffs' claims on their merits. But, in all events, a quick glance at the substantive First Amendment question reinforces that summary judgment for Senator Jackson was proper. The Complaint asserts that Senator Jackson's Twitter account "is a public forum subject to First Amendment protection." ROA.102. Resolving that issue is an important first step in the First Amendment analysis because it dictates the framework of the rest of the analysis. But Plaintiffs' vague assertion

betrays that they (understandably) do not know how to frame up the supposed "public forum."

"There are two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020). "Traditional public forums are places such as sidewalks, streets, and parks that have traditionally been devoted to assembly or debate." *Id.* "Designated public forums are places that the government has designated for the same widespread use as traditional public forums." *Id.* "Limited public forums are places that the government has opened for public expression of particular kinds or by particular groups." *Id.* And "[n]onpublic forums are forums that are not open for public communication by tradition or designation." *Id.*

Right off the bat, it is clear that Senator Jackson's Twitter account is not a traditional public forum because it is nothing like a sidewalk, street, or park. Similarly, it is not a limited public forum because there is no evidence that Senator Jackson opened it for particular kinds of expression by particular groups. And it also is not a designated public

forum because there is no evidence that Senator Jackson designated it "for the same widespread use as traditional public forums." *Id.*

So, at most, her account might be considered a nonpublic forum. And "[t]he government can restrict speech in a ... nonpublic forum as long as the restriction is (1) reasonable in light of the purpose served by the forum and (2) does not discriminate against speech on the basis of viewpoint." *Id.* at 426–27. The Senator's narrowly tailored blocking of Detiege because of her vitriol was, of course, eminently reasonable given Senator Jackson's efforts to keep her Twitter account free of racism and profanity. And for the same reason, blocking Detiege for her "burn in hell," "dumb," "black," and "bitch" attacks is not viewpoint discrimination in any sense of that term. *See, e.g., Iancu v. Brunetti*, 588 U.S. 388, 401 (2019) (Roberts, C.J., concurring in part and dissenting in part) ("The First Amendment protects the freedom of speech; it does not require the Government to give aid and comfort to those using obscene, vulgar, and profane modes of expression."); *see also id.* at 397 (maj. op.) (declining to address the government's argument that a restriction based on profane language "would not turn on viewpoint, and so we could uphold it"). As a

35

result, even on the merits of the First Amendment issue, Senator Jackson is plainly entitled to judgment as a matter of law.

## II.  THE DISTRICT COURT LACKED JURISDICTION.

Even if Plaintiffs could survive steps one and two of *Lindke* and the First Amendment analysis (they cannot), Plaintiffs' claims still could not survive summary judgment because the district court lacked jurisdiction to hear them. Those jurisdictional bars—Article III standing and statute of limitations for Sherman, and three distinct immunity doctrines for both Sherman and Detiege—thus provide an independent basis to affirm the dismissal of all of Plaintiffs' claims below.

### A. Sherman Lacks Article III Standing.

Sherman's case "begin[s]—and end[s]—with standing." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). "To establish standing, he "must demonstrate (i) that [he] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). He "must demonstrate standing for each claim [he] press[es] ... and for each form of relief [he] seek[s]." *Murthy*, 603 U.S. at

61 (cleaned up). And "[w]here, as here, the parties have taken discovery, [he] cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* at 58.

Discovery confirmed that Sherman failed to carry his burden—and that is because he has forfeited any argument that he has suffered an injury in fact for which he seeks redress. He claims that Senator Jackson blocked him on Twitter "for like ten years," beginning in 2013. ROA.752; ROA.754. But he also admitted that he was unblocked before the Amended Complaint was filed in August 2023, which (for the first time) named Sherman as a Plaintiff. ROA.753–54. And he never testified that he has any fear of being re-blocked, let alone any evidentiary basis for such a fear. *See* ROA.757 ("I don't recollect ever being reblocked.").

These undisputed facts doom his claims for injunctive and monetary relief. *First*, Sherman seeks "an injunction preventing Defendant Senator Jackson from restricting [his] future access to her Twitter profile." ROA.104. To obtain that relief, however, he "must establish" an injury that is "actual or imminent, not speculative— meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. Put otherwise, "when a

plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* But it is undisputed that there is no evidence he suffered any injury at the time he filed his Amended Complaint, which for the first time named him as a Plaintiff. Moreover, it is undisputed that there is no evidentiary basis that would allow Sherman to "establish a sufficient likelihood of future injury." *Id.* His claim for injunctive relief, therefore, is dead on arrival.

To the extent Plaintiffs argued below that Senator Jackson might effectuate some "policy" that might chill Sherman's speech sometime in the future, *see* ROA.1937–38, that is pure lawyer-speak. For Sherman never testified at his deposition that he has any fear of being re-blocked, let alone any evidentiary basis for such a fear. *See* ROA.757 ("I don't recollect ever being reblocked."). Moreover, his counsel's assertions are entirely speculative, which dooms Sherman. *See Murthy*, 603 U.S. at 58 ("Where, as here, the parties have taken discovery, [he] cannot rest on 'mere allegations,' but must instead point to factual evidence."); *see also All. for Hippocratic Med.*, 602 U.S. at 381. In addition, Sherman's self-serving claim below (at ROA.1939) that he "will censor himself in an attempt to avoid being blocked" (and thus, that's Article III injury) is

foreclosed by *Murthy*. *See* 603 U.S. at 73 (Plaintiffs "argue that they suffer 'continuing, present adverse effects' from their past restrictions, as they must now self-censor on social media. But the plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" (citation omitted)). And for the same reasons, a citation-less assertion that "Sherman's criticism of [Senator Jackson] will earn him a block after the conclusion of this suit" does not give him Article III standing for injunctive relief regarding alleged current or future harm. *See* ROA.1939.

*Second*, Sherman's Amended Complaint also sought "nominal and compensatory damages, not to exceed $20," ostensibly to remedy the claimed 2013 block that ended before he filed his claim. ROA.104. But he forfeited that request in his deposition. ROA.759 ("I am not seeking monetary compensation."). As a result, Sherman seeks no relief that would "redress that injury," *i.e.*, the 2013 block that expired before he filed his claim. *All. for Hippocratic Med.*, 602 U.S. at 381. His claim for monetary relief, therefore, is likewise dead on arrival.

Sherman's counsel below hinted that it would be "unreasonabl[e]" to expect Sherman to know "the exact legal remedies contained in

Plaintiffs' prayer for relief (drafted by his lawyers)." ROA.1942. Setting aside that "[t]he plaintiff"—not his counsel—"is the master of the complaint," *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (quotation marks omitted), Plaintiffs notably did not (and cannot) dispute that Sherman's sworn testimony unequivocally waives any request for monetary relief—and thus, he has no standing to assert a First Amendment claim based on alleged prior harm.

*Finally*, it bears noting that Sherman's sole explanation for "[w]hat [he] would really like to accomplish" in this case—despite no Article III injury—"is to have it settle law that elected officials and government agencies can't block American citizens on social media." ROA.758–59; *see* ROA.759 (Q: "So your goal is for there to be legal precedent established to that effect." A: "That is my goal." Q: "Are you looking to recover anything else?" A: "No."). The Supreme Court has long rejected this gambit, including just last year: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 381. Accordingly, "a citizen does not have standing to challenge a government

[action] simply because the plaintiff believes that the government is acting illegally." *Id.* That precisely describes Sherman. This Court can therefore affirm dismissal of Sherman's claims because he lacks Article III standing to bring them.

### B. Sherman's Claims Are Time-Barred.

Sherman's claims also are barred because he waited too long to sue. Because § 1983 does not contain a statute of limitations, the Supreme Court has held that courts must borrow "a forum state's general or residual statute of limitations for personal injury claims." *Brown v. Pouncy*, 93 F.4th 331, 332 (5th Cir. 2024). "In Louisiana, that period is one year" for causes of action arising before July 1, 2024. *Id.*; *see* 2024 La. Sess. Law Serv. Act 423 (H.B. 315) (amending Louisiana law to create a two-year limitations period for all causes of action arising after July 1, 2024).

By Sherman's own telling, "the interaction that ultimately led to Ms. Jackson blocking [him] occurred in 2013." ROA.752. "I'[d] been blocked for like ten years," he said, and then he "saw" news of Plaintiff Detiege's lawsuit and decided he wanted to join the lawsuit. ROA.754. There thus can be no question that Sherman's cause of action (if any)

arose in 2013, that he was aware of this fact for a decade, and then that he chose to sue in 2023—well after his one-year limitations period expired. *See, e.g.*, *Hearn v. McCraw*, 856 F. App'x 493, 495–96 (5th Cir. 2021) (per curiam) ("Accrual begins when a plaintiff is aware that he has been injured or has sufficient information to know as much."). His lawsuit is plainly time-barred.

Plaintiffs' arguments below on this point were—and remain—unavailing. Sherman primarily claimed that Senator Jackson forfeited his limitations problem. He is wrong. His forfeiture argument is based on a misunderstanding of the Federal Rules, which—when a party files a responsive pleading—generally require the party to include a limitations defense. *See* Fed. R. Civ. P. 8(c)(1). But after Sherman appeared for the first time as a plaintiff in the Amended Complaint, the parties proceeded directly to cross-motions for summary judgment; there was no responsive pleading. Courts within the Fifth Circuit have long held that a defendant does not "waive its defense of prescription" just because "it ha[s] not filed an answer to the complaint"—so long as the plaintiff "can adequately confront and defend against" the defense. *Jackson v. Am. Bankers Ins.*, 2006 WL 8456128, at *23 (E.D. La. Sept. 12, 2006) (citation omitted). In

fact, even if a defendant did file an answer and failed to include an affirmative defense, that defense is not automatically forfeited, so long as the plaintiff has a fair opportunity to respond to it. *See, e.g., Graham v. Hamilton*, 872 F. Supp. 2d 529, 541–42 (W.D. La. 2012); *Walker v. United States*, 2008 WL 2641334, at \*2–3 (W.D. La. July 1, 2008) (permitting affirmative defenses not raised in a responsive pleading); *see also Strong v. Green Tree Servicing, LLC*, 2016 WL 4095597, at \*8 (N.D. Tex. Aug. 1, 2016) (collecting cases where, as here, raising a defense at summary judgment was sufficient since "the party opposing summary judgment has a full opportunity to address the defense in its response"). Sherman's automatic forfeiture argument is meritless.

One final note: In unrelated contexts (typically employment-discrimination cases), the courts have sometimes relied on "the continuing violation doctrine" to save time-barred claims. That doctrine, of course, does not apply here. But, even if Sherman were tempted to try it out—as he suggested in his opposition to Senator Jackson's motion for summary judgment below, ROA.1945–47—this Court has repeatedly emphasized that the doctrine is satisfied only where a plaintiff can show that "there are separate-but[-]related acts at issue." *See Hearn*, 856

F. App'x at 496 (collecting cases). Sherman cannot do so because, "[s]imply, there is only one act at issue"—Senator Jackson's alleged blocking of him in 2013. *Id.* Accordingly, it is unmistakably clear that Sherman's claims are time-barred—and for that reason, too, it was plainly frivolous for Sherman to file his claims. This Court can affirm the dismissal of Sherman's claims on that basis as well.

## C. Plaintiffs' Claims Are Barred in Their Entirety by Senator Jackson's Immunity.

Plaintiffs' claims fare no better together because, even assuming all of their allegations and evidence in their favor, their claims are barred by qualified immunity, the Eleventh Amendment, and legislative immunity.

### 1. Qualified immunity independently bars the individual-capacity claims.

To begin, Plaintiffs have no way around Senator Jackson's qualified immunity, even assuming all of their arguments and evidence in their favor (including that Senator Jackson allegedly engaged in state action). "Qualified immunity shields a[] [state official] from liability if his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ramirez v. Escajeda*, 44 F.4th 287, 291 (5th Cir. 2022) (quoting *Pearson v. Callahan*,

555 U.S. 223, 231 (2009)); *see, e.g.*, *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022) ("[E]ven an award of nominal damages would be foreclosed if Defendants are entitled to qualified immunity."). "To overcome qualified immunity," a plaintiff "must show that [the defendant] (1) violated a constitutional right and (2) that the right at issue was clearly established at the time of the alleged misconduct." *Ramirez*, 44 F.4th at 291 (cleaned up).

This analysis is easy here: Assume *arguendo* that Plaintiffs established that Senator Jackson violated their First Amendment rights (although she did not, *see supra* Section I.B) by blocking them on Twitter. Plaintiffs would still need to show that this alleged First Amendment violation was "clearly established" by 2013 (for Sherman) and by 2022 (for Detiege). That is an impossible burden for them to carry. "The clearly established inquiry is demanding"—it requires that "existing precedent [] squarely govern the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Ramirez*, 44 F.4th at 292 (cleaned up). And not just any precedent: The specific facts must be directly addressed and clearly established by Supreme Court precedent, or

(maybe) Fifth Circuit precedent. *See id.* at 293 ("[T]he plaintiffs' argument requires us to assume that Fifth Circuit precedent alone can clearly establish the law for qualified immunity purposes, something the Supreme Court has left open.").[2] "[T]he plaintiff," moreover, "has the burden" to show as much. *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1005 (5th Cir. 2023).

Plaintiffs cannot carry that burden. For, as of 2022 (and certainly as of 2013), there was no Supreme Court or Fifth Circuit precedent holding that a state legislator violates random Twitter users' First Amendment rights by blocking them. This is best demonstrated by the Supreme Court's *Lindke* decision in 2024. *See supra* pp.6–8. The whole point of *Lindke* was that it was unclear whether and when a plaintiff even has a cause of action under § 1983 to bring a lawsuit regarding the deletion of social-media posts or blocking of users. It goes without saying, therefore, that the Supreme Court plainly has never considered the second-level question whether and when those actions violate the First

---

[2] This open issue is beside the point in this case because Plaintiffs have no on-point Supreme Court or Fifth Circuit precedent. For preservation purposes, however, Senator Jackson respectfully submits that Fifth Circuit precedent alone cannot clearly establish the law for qualified-immunity purposes. *See Ramirez*, 44 F.4th at 293 n.9.

Amendment. The same is true of the Fifth Circuit. As best Senator Jackson can tell, as late as 2023 the Fifth Circuit has avoided any merits decisions in similar cases. *See Kallinen v. Newman*, 2023 WL 2645555, at \*4 (5th Cir. Mar. 27, 2023) (holding that plaintiff had not shown that the official engaged in state action and thus "we need not reach the question of applicability of qualified immunity"); *Robinson v. Hunt Cnty.*, 921 F.3d 440, 448, 452 (5th Cir. 2019) (permitting only municipal-liability claim to proceed on "assum[ption]" that County Facebook page was "a forum subject to First Amendment protection," and thus expressly avoiding qualified-immunity inquiry).

In the briefing below, Plaintiffs tried to take the qualified-immunity inquiry to 30,000 feet by reframing the rights question: "The impermissibility of viewpoint discrimination *in any forum*," Plaintiffs asserted, "is settled First Amendment law and has been at all times relevant to this litigation." ROA.1955. That high-level articulation of the alleged right in question does not fly for qualified-immunity purposes. *See, e.g., Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) ("There must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is

definitively unlawful. This rule is a demanding standard, and the Supreme Court has repeatedly told us not to define clearly established law at a high level of generality." (cleaned up)). Plaintiffs' cited cases in support of their wide-lens view of qualified immunity below—*Packingham v. North Carolina*, 582 U.S. 98 (2017), and *Robinson v. Hunt County*, 921 F.3d 440 (5th Cir. 2019)—do not change that result, as Senator Jackson explained at length before the district court. ROA.2119–20.

Because Plaintiffs cannot carry their burden to show that Senator Jackson violated their clearly established First Amendment rights, Senator Jackson is entitled to qualified immunity. While Plaintiffs cannot succeed on the merits of their claims, this jurisdictional backstop, as well as the others described below, provide this Court with yet another basis to affirm the district court.

As Senator Jackson pointed out in her district court briefing, the qualified-immunity analysis leaves only Plaintiffs' official-capacity claims standing—but it does not appear that Plaintiffs have even preserved official-capacity claims. *See* ROA.2120. To be sure, they have purported to sue Senator Jackson in her official capacity. But "that label

48

is not enough." *Attwood v. Clemons*, 818 F. App'x 863, 870 (11th Cir. 2020) (Grant, J., concurring in part); *see id.* at 869 (maj. op.) (declining to reach the issue because the parties agreed on the nature of the official-capacity claims). That is true here because Plaintiffs "target[] [Senator Jackson] not as a proxy for the sovereign, but for personal conduct that will not be repeated by [her] successor-in-office." *Id.* at 870 (Grant, J.). They "seek[] no relief from the office that [she] holds, allege[] no [Louisiana Senate] policy or custom regarding [senators'] social media accounts, and request[] no remedy that will in any way operate against the [Louisiana Senate] or any other state entity." *Id.* at 873; *compare, e.g.*, ROA.1937 (emphasizing request for "declaratory and injunctive relief to prevent Defendant from re-blocking [Sherman]"). As Plaintiffs now frame their claims, therefore, it appears that there are no true official-capacity claims, which would render irrelevant any discussion of sovereign immunity. However, out of an abundance of caution and to fully

brief the issues for this Court, Senator Jackson includes discussion of the Eleventh Amendment and legislative immunity below.

### 2. On Plaintiffs' theory, the Eleventh Amendment bars the claims.

The Eleventh Amendment—and a precise definition of Plaintiffs' claims—renders this next analysis quite simple. As discussed above, *supra* Section I.A, Plaintiffs' lawsuit depends on this Court first finding that Senator Jackson engaged in "state action" within the meaning of 42 U.S.C. § 1983. If she did not (and indeed she did not), then Plaintiffs have no viable § 1983 claims at all. But, even if Senator Jackson did engage in state action, that would mean that the Eleventh Amendment bars this lawsuit. Either way, therefore, Plaintiffs' lawsuit fails.

"The Eleventh Amendment [] bars a suit against a state official when 'the state is a real, substantial party in interest.'" *Hall v. Louisiana*, 974 F. Supp. 2d 944, 952 (M.D. La. 2013) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984)). And "a suit against state officials that is in fact a suit against a state is barred regardless of whether it seeks damages or injunctive relief." *Id.*

Here, for the reasons just stated, Plaintiffs' § 1983 claims work only if the Court assumes that Senator Jackson's Twitter activity is state

action. On that assumption, their suit is "in fact a suit against a state [that] is barred" in its entirety, absent an exception to that rule (and none is relevant here).[3] *Id.* The Eleventh Amendment thus easily disposes of this case even accepting (incorrectly) Plaintiffs' assumption that Senator Jackson engaged in state action.

### 3. On Plaintiffs' theory, legislative immunity independently bars the official- and individual-capacity claims.

The same is true under the rubric of legislative immunity. "It is well established that state legislatures acting within the scope of their legislative duties are immune from civil suits for damages." *Id.* at 954. While the courts disagree as to whether that immunity bars both official-capacity and individual-capacity claims, *see id.* at 955 (collecting cases on both sides of debate), Senator Jackson respectfully submits that Chief Judge Jackson was right to "hol[d] that legislative immunity bars not only [] claims for damages against state legislators in their personal

---

[3] As *Hall* explains, one commonly used exception is *Ex parte Young*, which in certain circumstances "permit[s] suits against state officials in their official capacity in order to enjoin enforcement of an unconstitutional state statute." 974 F. Supp. 2d at 953. As that description suggests, *Ex parte Young* is entirely irrelevant here. And for the same reason, Plaintiffs cannot legally press a § 1983 claim against Senator Jackson in her official capacity. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

capacity, but also precludes [] claims seeking prospective and injunctive relief against state legislators in their official capacities." *Id.*

Here (to recount what was repeated above), Plaintiffs' § 1983 claims are viable only if Senator Jackson engaged in state action—*i.e.*, that she was "acting within the scope of [her] legislative duties." *Id.* at 954. Indeed, Plaintiffs must advance that argument to try to invoke § 1983. But the more they do so, the more they walk into the domain of legislative immunity. On Plaintiffs' own account, therefore, the Court can simply hold that Plaintiffs have argued themselves into legislative immunity and affirm judgment as a matter of law in Senator Jackson's favor.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

Dated:  December 10, 2025

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ Caitlin Huettemann*
J. BENJAMIN AGUIÑAGA
Solicitor General
CAITLIN HUETTEMANN
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
HuettemannC@ag.louisiana.gov

Thomas M. Hayes, IV
HAMMONDS, SILLS, ADKINS,
GUICE, NOAH & PERKINS, L.L.P.
1500 N. 19th Street, Suite 301
Monroe, Louisiana 71201
Telephone: (318) 324-0101
Facsimile: (318) 322-5375
thayes4@hamsil.com

*Counsel for Senator Katrina
Jackson*

# CERTIFICATE OF SERVICE

I certify that on December 10, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Caitlin Huettemann*
CAITLIN HUETTEMANN

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3 and Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,559 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Caitlin Huettemann*
CAITLIN HUETTEMANN


Dated:    December 10, 2025